# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEBRASKA

STACY RYAN

Plaintiff,

vs.

STRECK, INC., a Nebraska corporation; CONNIE RYAN, individually and in her capacity as controlling shareholder; LARRY GIES, individually and in his capacity as controlling shareholder; CURTIS AKEY; W. WAYNE GATES; BILL FAIRFIELD; WILLIAM GERBER; GARY GATES; LISA ROSKENS; SUE THADDEN; MIKE CASSLING; MADISON STRECK HOLDINGS III LLC; MADISON STRECK HOLDINGS II LLC; STRECK, LLC, a Nebraska Limited Liability Company, FIRST NATIONAL BANK OF OMAHA, as former Trustee, CARRIE KREIFELS a/k/a Carrie Sanampudi, individually and in her capacity as Trustee of the Streck, Inc. liquidating Trust, and MATT KREIFELS individually, DS INTERMEDIATE, INC., a Delaware Corporation, and MADISON TECHNOLOGIES LIFE SCIENCE HOLDINGS, LLC a Delaware Limited Liability Company.

Defendants.

Case No.

**COMPLAINT**

COME NOW Plaintiff, Stacy Ryan ("Stacy"), individually and in her capacity as a Successor Trustee of the Eileen Ryan GST Exempt Marital Trust FBO John Ryan Coffey, Sean Coffey and Timothy Coffey and states, through her counsel, her causes of action against Defendants, Streck Inc., a Nebraska corporation ("Streck"); Connie Ryan, individually and in her capacity as controlling shareholder of Streck; Larry Gies, individually and in his capacity as controlling shareholder of Streck; Curtis Akey; Wayne Gates; Bill Fairfield; Madison Streck Holdings III LLC, Madison Streck Holdings II LLC and First National Bank of Omaha ("FNB"), as former Trustee of certain Eileen Ryan Trusts, Carrie Kreifels, individual and in her capacity as Trustee of the Streck, Inc. liquidating Trust, Matt Kreifels, DS Intermediate, Inc., and Madison Technologies Life Science Holdings, LLC does hereby state as follows:

## Intro

## Protecting "Our Deal"

*On the eve of closing "our deal" Connie Ryan and Larry Gies, the controlling shareholders of Streck, Inc. and Madison Industries share self-congratulatory and self-serving e-mails about successfully protecting "our deal" from a $2,000,000,000 third-party unsolicited offer (an arms-length offer **$400,000,000** higher than their insider deal):*

> On Jan 23, 2023, at 12:01 PM, Constance Ryan <CRyan@streck.com> wrote:
>
> Thanks. I know it's the right thing to do to protect our deal.
> Connie
>
> <image001.jpg> **Constance Ryan** CEO & Chairperson
> Direct 402-691-7438 | Main 800-843-0912
> CRyan@Streck.com
> streck.com

*See E-5 107* [1]

**From:** Larry Gies <lgies@madison.net>
**Sent:** Monday, January 23, 2023 1:58 PM
**To:** Constance Ryan <CRyan@Streck.com>
**Subject:** Re: Project Owl/Information Statement

You are right. It's just a bogus offer and makes me mad they did this because it's not real. They would have destroye the business over the coming year of antitrust review (assuming deal even got that far) and then abandoned the deal horrible. Agree with you.

Larry Gies
**MADISON INDUSTRIES**
*making the world safer healthier & more productive* www.madison.net

*See E-5 107*

Message

| | |
|---|---|
| **From:** | Larry Gies [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=50209E2CD8D147A19802D7C913605449-LGIES] |
| **Sent:** | 1/23/2023 2:04:53 PM |
| **To:** | Constance Ryan [CRyan@streck.com] |
| **Subject:** | Re: Project Owl/Information Statement |

Agree. U r spot on Connie. Bogus offer that would never happen.

Larry Gies
**MADISON INDUSTRIES**
*making the world safer healthier & more productive* www.madison.net

*See E-5 107*

[1] For ease of reading and drafting, each exhibit has is stamped. The reference above is to Exhibit E-5 p. 107.

*"Our Deal" successfully closes and Madison Industries issues their Press Release*

## 22 FEB STRECK JOINS MADISON INDUSTRIES

**February 21, 2023 – CHICAGO**

"Since meeting Connie over seven years ago and being so impressed, I promised her that when she called, we would be there to partner with her," said Madison Founder and CEO Larry Gies. "The Streck name is celebrated in every hospital, clinic and laboratory around the globe and is perfectly aligned with our mission to make the world safer, healthier and more productive. I am thrilled to be a small part of the passionate Streck team with Connie leading us forward!"

*Connie's praise of Defendant Madison Industries*

I met Larry Gies, the CEO of Madison, approximately five years ago. He often invited me to Madison's Owner Day. This year, I attended for the first time. Larry and I had several discussions about Madison and how Streck would fit into this multi-dimensional company. Streck will be part of the medical division. Madison's vision of making the world safer, healthier, and more productive fits well with Streck's mission.

***Summary of the Scheme***

As Plaintiff worked to assemble this complaint, it has grown exponentially in paragraphs and word count. The sheer volume of the complaint is a result of Plaintiff's intent to comply with the Private Securities Litigation Reform Act's strict pleading requirements. Accordingly, the following summary is provided so that the Court and Defendants may understand the essence of the scheme before reading the detailed fully substantiated allegations.

At its core, this case is about how Defendant Connie Ryan—then the President, CEO, and controlling shareholder of Streck, Inc.—and Defendant Larry Gies, the founder and controlling person of Madison Industries, were able to complete a self-dealing below market sale of Streck to Madison Industries while systematically concealing the company's true value from Plaintiff and her, who together were the beneficial owners of over 1,000,000 shares of Streck common stock.

The scheme proceeded in stages. First, in June 2022, while Connie Ryan was already engaged in secret negotiations with Gies to sell Streck at Madison Industries a price reflecting enterprise values of $1.13 billion to $1.3 billion ($60–$68 per share), Streck and Connie Ryan represented to Plaintiff during a mediation (involving Stacy's separate litigation against Streck involving approximately 2,700,000 Steck shares (including 5,500 voting shares gifted to her by her parents) that her shares were worth "just under $27 per share." based on an independent 2021 Stout Revis valuation. [2] This was a knowing lie: Streck possessed annual independent valuations from Stout Risius Ross showing the shares were worth more than double that figure. The false $27 representation induced Plaintiff to execute a Mediation Settlement Memorandum at approximately $39 per share—a fraction of real Stout Revis stated value.

Second, Defendants used the fraudulently obtained Mediation Settlement Memorandum[3] as a weapon. Between September 2022 and February 2023, while finalizing the Madison Transaction, Defendants repeatedly threatened to hold Plaintiff and her sons to the $39 per share price if they did not execute a superseding Confidential Settlement Agreement on Defendants' terms. They forced Plaintiff's silence and capitulation by telling her that if the Madison

[2] A copy of the Mediation Statement Letter is attached as Exhibit A to this complaint. The lies about the $27 value of Streck was also repeated directly by Connie Ryan and communicated to Plaintiff at the subsequent June 17, 2022 in person mediation.

[3] A copy of the Mediation Settlement Memorandum is attached as Exhibit B to this complaint.

Transaction did not close she would only receive $39 per share, when in truth, the Mediation Settlement Memorandum was not enforceable because the $27 per share price representation used to get her to sign it was not accurate.

Third, throughout this period, Defendants engaged in a calculated campaign of selective disclosure designed to create the illusion of transparency while concealing the facts that would have revealed the scheme. The shareholder letters and Information Statement disclosed the existence of the Madison Transaction, but omitted Stacy Ryan's separate deal (the Mediation Settlement Agreement) Streck had with Stacy Ryan. The existence and magnitude of Connie Ryan's secret rollover was hidden until the last minute and buried in the disclosures. The $2 billion competing offer from Bio-Rad that Connie Ryan personally blocked was hidden and recast as a distraction to the pertinent question of whether the Madison Transaction was fair or not.

Then incomplete disclosures were only given after they were of no value to Plaintiff. This is why Defendants actively forced Plaintiffs capitulation with a fraudulently obtained Mediation Settlement Agreement. The delayed timing of the disclosures was a purposeful act against Plaintiff to force her compliance.

This valuable information was purposefully made available to Madison Industries when it was relevant to it, but not Plaintiff. This is because Defendants wanted to hold it until it was of no value to Plaintiff. The information provided in the shareholder disclosures was only made available after Larry Gies had obtained voting control and could force the sale to himself. This was all done to compel Plaintiff to reconfirm her agreement to dismiss her litigation, a contractual condition to close the Madison Transaction.

The fact that Plaintiff's agreement to dismiss her litigation was an express condition to closing the deal—gave Plaintiff enormous leverage she never knew she had. The leverage was neutralized by the false threat that Streck, Inc. could force

Plaintiff and her sons to receive $39 per share at closing rather than $70.10, when in truth, there would not be a closing at all if Stacy and her sons did not sign the Confidential Settlement Agreement.[4] The threats were false because Defendants knew the $27 value they used to induce the Mediation Settlement Agreement was false.

The threats were so effective that Plaintiff remained compliant to the point of reasonably believing that if the Madison Transaction did not close she and her sons would only receive $39 per share rather than $70.10 per share. The pertinent issue of whether the Madison Transaction was fair to Plaintiff, became irrelevant to Plaintiff from her perspective because she was led to believe her only option was to be compliant so she at least would get her and her sons the Madison Transaction price rather than the Mediation Settlement Agreement price of $39. Stacy, until January of 2025 when the Bills of Exception came available to the public, did not know that she was not bound by the Mediation Settlement Memorandum.

Fourth, Connie Ryan affirmatively lied to shareholders by representing during an October 17, 2022 recorded call[5] that she and her son (Defendant Matthew Kreifels) would be "selling" their shares like everyone else, when she was in fact negotiating a substantial rollover of approximately $40 million in equity into the Madison acquisition vehicle—giving her a substantial equity position. Until it was too late to matter, Connie Ryan hid the fact that she was both a buyer and a seller in the Madison Transaction.

Fifth, to lock in the transaction, Connie Ryan sold Gies enough Class A voting shares to make him the controlling shareholder, enabling him to force the sale to his own company, Madison Industries—Gies himself admits in sworn

---

[4] A copy of the Confidential Settlement Agreement Plaintiff was fraudulently induced to sign on February 20, 2023 is attached hereto as Exhibit C to this complaint. The redaction contained therein are redactions of Plaintiff's counsel's handwritten notes.

[5] A software transcribed copy of that recorded call is attached to this Complaint as Exhibit D. The reader can e-mail to paulh@orrlawgroup.com to request a copy of the .wav file.

testimony his view that *his obligations were to Madison Industries*[6], with no concern that being a controlling shareholder of Streck at the time, he simultaneously owed fiduciary duties to Plaintiff in her capacity as a minority shareholder of Streck. No Defendant apparently ever took note of the conflict, including the supposedly "independent" directors who fully approved Gies's and Connie Ryan's gambit to transfer control to Gies. Gies (despite being a fiduciary) also made no effort to share his own internal Madison Industries valuation of Streck with anyone before he voted in favor of closing the deal—and no Defendant bothered to press for such disclosure.

Sixth, Defendants rejected without meaningful investigation a $2 billion competing offer from Bio-Rad—representing a 25% premium over the Madison price—because it threatened "our deal." The Board focused on a concocted pre-textural bi-lateral choice of either selling to Madison or selling to Bio-Rad.[7] They did not bother to take both offers to the wider market to see if the bids would go even higher by hiring an investment banker. The board did not consider the obvious option of <u>not selling</u>. The Board conducted no real antitrust analysis because it was a pretext, and never even asked Madison to match the price. Consistent with this farce, Connie Ryan personally told Bio-Rad "they could not negotiate" based on an "exclusive negotiations" clause with Madison that was days from expiring.

Even assuming for the fun of the exercise that this bi-lateral choice was an actual dilemma, the logic was nonsensical. That reality would mean that Connie

---

[6] See Gies testimony at E-3 081.

[7] Director W. Wayne Gates in his deposition evaluated the false choice this way when asked about why they did not evaluate other offers. "And so the fiduciary, I felt, I was I didn't want to – I had pretty good offer, a 30 percent premium over the value of the [Stout] value of the company. It had been evaluated as fair, and to do the right thing for all the shareholders, to let that expire and perhaps be in a long process, didn't benefit the shareholders." E-7 078. In other words, "not wanting a long process" and having a $1.6 Billion dollar offer was "good enough." Disappointingly, Mr. Gates would subsequently vote to allow Larry Gies to buy a controlling interest in Streck so that Gies would be in position to remove him from the board if Mr. Gates ever expressed reservations about the Madison Transaction. But, Mr. Gates stayed in line and voted to approve the Madison Transaction and Larry Geis subsequently voted his controlling interest in Streck in favor of the transaction as well.

Ryan and Larry Gies siphoned off at least $400,000,000 in value from shareholders of Streck to Madison Industries and to Connie Ryan and her children as a rollover buyers. This is because the value could have stayed with the shareholders if the obvious choice not to sell was considered. The exclusive negotiating period ended on January 1, 2023 and Steck was not bound to any deal until it signed its binding agreement with Madison on February 9, 2023. The obvious choice not to sell was never considered because Larry Gies and Connie Ryan were going to do "our deal" no matter what.

The result of the scheme was that Plaintiff was fraudulently induced to sell her Streck shares and surrender valuable litigation claims for $70.10 while Defendants knew the shares were worth much more. Meanwhile, Connie Ryan preserved for her and her children a continuing equity stake in Streck, Gies controlled Madison Industries acquired a $1.6 billion company for at least a $400,000,0000 below-market price avoiding an open sales process with competitive offers, and FNB—the very trustee charged with protecting Plaintiff's interests—facilitated the fraud by providing Plaintiff with an irrelevant "in house valuation" of $20 per share and never failed information about the Madison Transaction that any competent trustee would have obtained, ignoring repeated requests for information from Stacy Ryan.

No prudent fiduciary would review the proposed Madison Transaction and then approve it by allowing Larry Gies and Connie Ryan to in effect sell Streck to themselves at a price they negotiated between themselves. But that is what happened. Plaintiff's damages exceed hundreds of millions of dollars.

## PUBLIC RECORDS & HOW STACY RYAN DISCOVERED THE DEFENDANTS SCHEME

1. The twelve volume Bill of Exceptions ("BOE")[8] used to establish Plaintiff's claims are public records lawfully obtained from the State of Nebraska's official court records system before any sealing order was entered. No court order, rule, or statute authorizes the suppression of information already disclosed to the public through official state channels.

2. On January 28, 2025, twelve volumes of the Bill of Exceptions were filed in the Nebraska Court of Appeals in connection with an appeal from the District Court of Sarpy County, Case No. CI 23-886. Upon filing, all twelve volumes appeared as publicly accessible records on the Nebraska Judicial Branch's JUSTICE case search system.

3. On February 25, 2025, Ms. Ryan accessed the JUSTICE system and observed that all BOE volumes were displayed with live, clickable links on the official nebraska.gov website. She captured a contemporaneous screenshot, timestamped by her computer's operating system, documenting this public accessibility. That screenshot appears below:

[8] These BOE volumes are attached to this complaint as Exhibit E-1 through Exhibit E-12. Wherever practical given time constraints of Plaintiff, Plaintiff has attempted to cite specific page numbers when referencing evidence contained in the BOE volumes using the bates placed thereon by Plaintiff which do not appear in the original BOE i.e. BOE 1-12 etc. The BOE is also modified to redact confidential bank account information of Plaintiff, which was not done in the original BOE's when they were made publicly available. The unredacted BOE's are public records. The redactions in Exhibits E-1 through E-12 are only made to redact the bank account and financial information that Streck promised it would redact under the terms of fraudulently induced Confidential Settlement Agreement.




4. It was not until April 9, 2025—over ten weeks after the BOE was filed—that Streck, Inc. filed a motion to seal the BOE volumes in the District Court. Judge Cox entered the sealing order on April 11, 2025. Per the docket, the system did not restrict access until mid-April 2025 at the earliest.[9]

5. On May 16, 2025, Streck's counsel Victoria H. Buter of Kutak Rock LLP wrote to Ms. Ryan and expressly confirmed the BOE's public status. Ms. Buter stated: "When the Bill of Exceptions was transmitted by the Court to the Appellate Court, it appears that it became public."[10] Ms. Buter further stated that "when Streck learned that the Bill of Exceptions was public, it moved to seal the Bill of Exceptions, first at the appellate level and then at the district court level." This communication constitutes an admission by Streck, through

[9] For the convenience of the court and the reader the motion to seal and order (captioned a [PROPOSED ORDER]) along with a copy of the full docket are attached as Exhibit F to this complaint. See F-1 through F-50). No statutory or other required justification was ever alleged or otherwise properly found to seal the records.

[10] Copies of the full e-mail exchange between Plaintiff and Buter is attached as Exhibit G. The redacted portions are text written by Plaintiff to her counsel.

its counsel, that the BOE was publicly available before any sealing order was entered. See actual e-mail below:

6. The Nebraska Constitution provides that "[a]ll courts shall be open." Neb. Const. art. I, § 13. The Legislature has implemented this mandate through Neb. Rev. Stat. § 24-1001, which states that "[a]ll judicial proceedings of all courts established in this state must be open to the attendance of the public unless otherwise specially provided by statute."

7. The controlling statute on public records access, Neb. Rev. Stat. § 84-712.05, provides that records which might otherwise be withheld from public access lose that protection once they have been "disclosed in an open court, open administrative proceeding, or open meeting or disclosed by a public entity pursuant to its duties." Here, the State of Nebraska, through its own JUSTICE system, disclosed the BOE volumes to the public. That disclosure was made "by a public entity pursuant to its duties"—the very language of § 84-712.05.

8. As Nebraska Judge Alan G. Gless of the Fifth Judicial District explained in his authoritative 2007 essay on public access to Nebraska court records: "once non-public information is disclosed in open court, or by public filing, or otherwise, the information ceases to be non-public and Nebraska state courts may not withhold that information from public access." *Public Access to Nebraska State Court Records and Proceedings* 20 (2007).

9. The United States Supreme Court has likewise held that information lawfully obtained from public court records cannot be suppressed. In *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 496 (1975), the Court held that "the First and Fourteenth Amendments command nothing less than that the States may not impose sanctions on the publication of truthful information contained in official court records open to public inspection." And in the

seminal Nebraska case, *Nebraska Press Association v. Stuart*, 427 U.S. 539, 596 (1976), Justice Brennan's concurrence—cited with approval by Nebraska courts—stated that whatever has "been revealed in open court proceedings or through public documents [such as case filings] . . . is public property" and that "further disclosure of such information can [not] be suppressed before publication or even punished after publication."

10. This distinction is well established. The Nebraska Supreme Court's Guidelines for Determining When and Under What Conditions a Hearing May Be Closed provide that even when proceedings are closed, "all matters heard by the court after the general public has been excluded shall nevertheless be on the record and shall be made available for public inspection within a reasonable time after a final judgment or verdict in the case has been rendered." Guideline 4. If records from closed proceedings must eventually be made public, a fortiori, records that were already public cannot be retroactively rendered secret.

11. **Neb. Ct. R. § 6-1521(G)** (Uniform District Court Rules — Protection of Personal and Financial Information in Civil Court Records) states that responsibility for redacting personal and financial data set forth in § 6-1521(A) rests solely with counsel and the parties. The clerk of the court shall not be required to review documents for compliance with this rule. The rule goes on to say that if a clerk of the court identifies a violation of this rule, the clerk may, at his or her option, provide a redacted document for public access. However, the clerk electing to provide a redacted copy for public access shall maintain the original document without any alterations thereof, which document shall only be available to the court and the parties or the parties' counsel.

12. **Nebraska General Rule 1.3** contains the same principle: The responsibility for redacting personal data identifiers rests solely with counsel and the parties. The clerk's office will not review documents for compliance with this rule, seal

on its own motion documents containing personal data identifiers, or redact documents

13. The BOE volumes attached as Exhibits E-1 through E-12 were lawfully obtained from the State of Nebraska's official court records system while they were publicly accessible. Streck's own counsel confirmed the records were public. The subsequent sealing order does not and cannot retroactively strip the public character from information already lawfully in the possession of a nonparty. Any motion practice aimed at suppressing, restricting, or sanctioning the use of these records in this proceeding is without legal foundation.

**PARTIES**

14. Plaintiff Stacy is a natural person and resident of Douglas County, Nebraska. At the time of the events alleged herein, and (pending recission), Stacy Ryan is the beneficial owner of 887,304.4 shares of nonvoting common stock of Streck transferable to her from her mother's trust. Stacy is also party to litigation against Streck in the District Court of Sarpy County, Nebraska, Case No. CI19-548 wherein she seeks to determine the fair value of approximately 2,700,000 non-voting shares of Streck and 5,500 voting shares (the "Share Value Litigation"). All these shares were made part of a mediated settlement Connie Ryan and Streck Negotiated with her and finalized on June 17, 2022 through a Mediation Settlement Memorandum (the "Mediation Settlement Memorandum" or "MSM") which was subsequently superseded by a superseding confidential Agreement (the "Confidential Settlement Agreement" or "CSM") signed by Stacy and her sons on February 20 and 21st, 2023.

15. Plaintiff Stacy Ryan in her capacity as a successor Trustee of the Eileen Ryan GST Exempt Marital Trust FBO Coffey, and as court ordered trustee for her

children's 2,800 shares under her deceased mother's grandchildren's GST Trust John Ryan Coffey, Sean Coffey and Timothy Coffey (the "Coffey Children Trust") pending recission is the legal (but not beneficial) owner of 8,400 shares of Streck Inc. Non-Voting Class B stock by virtue of the recission rights described herein.

16. Defendant Streck, Inc. is a Nebraska corporation with its principal place of business in La Vista, Sarpy County, Nebraska. At all relevant times, Streck was a closely held corporation.

17. Defendant Connie M. Ryan ("Connie Ryan") is a natural person and resident of Nebraska. At relevant times, Connie Ryan was the President, CEO, and a Director of Streck. Connie Ryan together with Larry Gies caused Streck's February 2023 transaction with Madison Streck Holdings III LLC described in further detail below (the "Madison Transaction"). Unbeknownst to Stacy, Connie Ryan has been pursuing the Transaction with Madison for years. In 2022 Connie sealed the deal. Connie seemingly never had any intent to engage in an open sales process (like Steck attempted to do in 2014 when she was also an officer of Streck). Connie stated in October 2022 after the Mediation Settlement Memorandum was signed "this past year I attended [Madison] meetings he had with his CEO's and talked to other people". "I met a couple of guys who had sold their businesses that still provided support." And "it is very much a community." See Transcript of October 17, 2023 call further described below. Connie Ryan on that same call reiterated that the employees were glad that their primary worry that the Company would be moved is resolved "it was a huge positive response" and "they felt it provided them what they were looking for."

18. Defendant Larry Gies ("Gies") is a natural person and resident of Illinois. Gies is the founder and controlling person of Madison Industries, LLC and its affiliated entities, including Madison Streck Holdings III LLC and Madison

Streck Holdings II LLC. Gies, according to Madison Industries 2023 press release had been pursuing a transaction with Streck for over seven years. In October of 2022 he stated that since talking with Connie Ryan "quite a few years ago" and since that time has been "bugging her" and telling her "we can be that final home for that beautiful business" and that "I think the platform we have at Madison is very conducive to not only making sure the business is here forever, but growth of the business." See Transcript of October 17, 2023 call below.

19. Defendant Curtis Akey ("Akey") is a natural person and resident of Nebraska. At all relevant times, Akey, a CPA, was the Chief Financial Officer and Corporate Secretary of Streck. Akey signed the Confidential Settlement Agreement on behalf of Streck as directed by Connie Ryan and Larry Gies. Akey personally received approximately $1.7 million in phantom share payments in connection with the Madison Transaction.

20. Director Defendants, Bill Fairfield, Bill Gerber, W. Gary Gates, Lisa Roskens, Sue Thaden, Jack Becker, and Mike Cassling are natural persons and, upon information and belief, all residents of Nebraska. At all relevant times, these defendants were directors of Streck. Each of them voted to approve the Madison Transaction in breach of their fiduciary duties to Plaintiff. Connie Ryan was also at all relevant times a Streck Director.

21. Defendant Madison Streck Holdings III LLC ("Madison III") is a Delaware limited liability company controlled by Larry Gies. Madison III was the purchaser in the Madison Transaction.

22. Defendant Madison Streck Holdings II LLC ("Madison II") is a Delaware limited liability company controlled by Larry Gies. Madison II is the vehicle through which Connie Ryan and her children defendants Matt Kreifels and Carrie Kreifels retained equity participation in the post-Madison Transaction entity while Plaintiff was fraudulently induced to not have that same right.

23. Defendant Streck, LLC is a Nebraska Limited Liability Company to which Streck Inc. transferred its assets to as part of the Madison Transaction.

24. Defendant First National Bank of Omaha ("FNB") is a national banking association with its principal place of business in Omaha, Douglas County, Nebraska. At relevant times, FNB served as Trustee of the Eileen Ryan Marital Trust and other trusts holding Streck shares for the benefit of Plaintiff Stacy Ryan and her sons.

25. Defendant Matt Kreifels is Connie Ryan's son and rolled, with Connie Ryan, his interests in Streck into Madison II. As a shareholder in a closely held corporation, Matt Kriefels at all times was a fiduciary to Plaintiff.

26. Defendant Carrie Kreifels is Connie Ryan's daughter and rolled her interests in Streck into Madison II with Connie Ryan. As a shareholder in a closely held corporation, Carrie Kreifels always was a fiduciary to Plaintiff. Carrie was appointed by Connie to act as the sole Trustee of the Streck Liquidating Trust and established the Liquidating Trust at JP Morgan in New York City where Carrie Kreifels (a/k/a Carrie Sanampudi) lives.[11]

27. Defendant DS Intermediate, Inc. is a Delaware Corporation that acted as the contributor of securities held by it in exchange for Rollover Units as described in that certain Securities Purchase Agreement which resulted in Madison Transaction.

28. Madison Technologies Life Science Holdings, LLC is a Delaware limited liability company controlled by Gies that now holds substantially all of the assets formally owned by Streck as a result of the Madison Transaction.

---

[11] Carrie Kreifels recently mailed Streck distributions to Stacy and her son, Ryan Coffey to another Stacy Ryan who lives in Louisville, Nebraska even though she had access to Plaintiff's correct Omaha address, phone and Stacy's email. For decades, Stacy Ryan has been continuously and systematically subjected to this type of deliberate obfuscation and misdirection by Streck and its management.

## JURISDICTION AND VENUE

29. This Court has subject matter jurisdiction over this action pursuant to Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction). This action arises under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission, 17 C.F.R. § 240.10b-5.

30. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a) because the state law claims are so related to the federal securities claims that they form part of the same case or controversy under Article III of the United States Constitution. The state law claims arise from the same nucleus of operative facts as the federal claims—namely, Defendants' fraudulent concealment of the true value of Streck, Inc. shares in connection with the February 2023 Confidential Agreement and the contemporaneous sale of Streck and the Mediation Settlement Memorandum.

31. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). A substantial part of the events or omissions giving rise to the claims occurred in this District. Defendant Streck, Inc. is a Nebraska corporation with its principal place of business in La Vista, Sarpy County, Nebraska. Defendants Connie M. Ryan and Curtis Akey are citizens of Nebraska who reside within this District. The fraudulent misrepresentations and omissions at issue were made in this District, the Confidential Agreement was negotiated and executed in this District, and Plaintiffs suffered their injuries in this District.

32. In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of a national securities exchange, thereby

satisfying the jurisdictional requirements of Section 10(b) of the Exchange Act.

## GENERAL NATURE OF THE ACTION

33. This is an action for rescission, fraud, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, violations of the Nebraska Securities Act, and violations of privacy arising from a scheme by controlling shareholders Connie Ryan and Larry Gies. Plaintiff also pleads breach of contract in the alternative.

34. All facts are confirmed in twelve volumes of the Bill of Exceptions filed in Streck, Inc. v. Carol Ryan, et al., Case No. CI 23-886 (Sarpy County District Court) ("BOE") filed as a public record, which includes deposition transcripts, emails, transaction documents, and other evidence. Additional evidence is contained in a recorded telephone conference call involving the parties on October 17, 2022 ("Recorded Call Transcript"). The sealed case files were made available to anyone with access to the court's electronic filing system from January through April 2025 and were available on Sarpy County's public access terminals as well.

35. Plaintiff and her sons are not and have never been (nor under the terms of the Confidential Settlement Agreement described below could they have been) parties to the litigation in Case No. CI 23-886 (the "Appraisal Rights Litigation").

36. Plaintiff seeks rescission of the fraudulently induced February 2023 Confidential Settlement Agreement that she and her sons were fraudulently induced to sign, damages for securities fraud, common law fraud, and breach of fiduciary duty, and such other relief as justice requires. Plaintiff reserves the right to plead in the alternative and elect alternative remedies as this litigation proceeds.

## DETAILED TIMELINE AND FACTUAL BACKGROUND

37. Streck, Inc. was founded by Dr. Wayne Ryan in 1971. At all relevant times, Streck was and is a closely held Nebraska corporation engaged in the manufacture of medical diagnostic products.

38. Dr. Wayne Ryan and his wife Eileen Ryan had five children: Connie (Connie) Ryan, Timothy Ryan, Stacy Ryan, Carol Ryan, and Steven Ryan.

39. Members of the Ryan family held shares in Streck either directly or as beneficial owners as beneficiaries of various trusts. Until January 2023 when she sold voting shares to Gies just prior to the closing of the Madison Transaction, Defendant Connie Ryan was the controlling voting shareholder. Connie Ryan at all relevant times held the positions of President, CEO, and Director of Streck.

40. In 2012, Streck forcibly bought out some of Stacy Ryan's shares pursuant to a stock redemption agreement. Streck represented that the purchase price was based on the fair market value of the shares as set forth in the most recent valuation prepared by Juris Valuation Advisors, LLC ("JVA").

41. Streck paid Stacy Ryan $9,280,235 for her shares based on a 2011 JVA valuation showing voting shares at $3.49 per share and nonvoting shares at $3.32 per share.

42. A July 27, 2012 JVA valuation showed the shares were worth $4.42 per share for voting shares and $4.21 per share for nonvoting shares.

43. "In 2015 Stacy Ryan filed a lawsuit first in state court, then in federal court bringing several claims against Streck relating to the purchase of her shares in 2012. Streck moved to dismiss all the claims brought by Stacy Ryan, and the Motion to Dismiss was granted by Judge Smith Camp." *See Exhibit A.*

44. On appeal the 8th Circuit reversed and allowed a "claim for breach of contract to proceed" and remanded the case back to District Court. *Id.*

45. The District Court declined to exercise its discretionary supplemental jurisdiction and on remand the matter was transferred back to Sarpy County District Court as matter no. CI-19-548 in 2019 (the "Share Value Litigation").

46. Honorable Judge Nathan Cox then ruled that the statue of limitations had run on the contract claim and dismissed the claims.

47. That dismissal was reversed by the Nebraska Supreme Court because the statute had been tolled during the time it was being litigated in Federal District Court and the case was again remanded for further proceedings in *See Ryan v. Streck, Inc., 309 Neb. 98 (2021).*

48. Thus, from the time of remand to today the litigation over the value of those shares remains pending and involves claims for approximately 2,700,000 nonvoting shares and 5,500 voting shares of Streck stock (the "Share Value Litigation").

49. Stacy and sons were also parties a case filed in 2019 in Douglas County District Court entitled *Stacy Ryan et. al. v. Streck, Inc. and its Board of Directors Case No. CI-19-7847.*

50. The Douglas County District Court litigation challenged amendments to the Bylaws adopted on January 15, 2019 (the "Bylaw Litigation") which created new restrictions on the shares of Streck owned or beneficially owned by the family members including a right of first refusal in favor of Streck to prevent shareholders from selling their shares.

51. These restrictions, made without the consent of the owners or beneficial owners, restricted shareholders and beneficial owners like Plaintiff and her sons from selling their shares for fair value.

52. In 2022 and prior thereto Streck and Connie Ryan were involved in ongoing negotiations with Larry Gies and Madison Industries to sell Streck to Madison Industries on a "per share" basis at a price far higher than what was being represented as the fair value of Streck to Plaintiff in mediation. By June 1, 2022 Madison Industries and Streck signed a confidentiality agreement and they immediately thereafter began to share financial statements and other confidential information that Madison Industries needed to evaluate the contemplated sale of Streck to Madison Industries. *See Deposition of Larry Gies of April 26, 2024 p. 9-28.*

53. Gies had been pursuing Streck as an acquisition target for 7 years. In a 2023 call discussing the deal he confirms that Gieshas been pursuing a transaction with Streck since talking with Connie "quite a few years ago" and since that time has been "bugging her" and telling her "we can be that final home for that beautiful business" and that "I think the platform we have at Madison is very conducive to not only making sure the business is here forever, but growth of the business." *See Recorded Call Transcript.*

54. Connie Ryan too confirmed had been pursuing a deal stating in the same call with shareholders that "this past year I attended his meetings he had with his CEO's and talked to other people". "I met a couple of guys who had sold their businesses that still provided support." And "it is very much a community."

55. The delivery of information to Madison Industries by Streck allowed Connie Ryan and Larry Gies to come to final terms in early 2022 which culminated Madison Industries letter of intent on September 1, 2022. "Q What negotiation of the $1.3 billion figure was there before this document was signed by both Ms. Ryan and you on September 1, 2022? A Yeah, so there were changes made to the terms, some of the terms and conditions. And the Price was also changed. We had offered 1.3. And Connie brilliantly made

that the floor. And there were discussions that Connie and I had. There was discussions that Brian Richards and Dale Dixon had. And then Brian would communicate those back." Larry GiesDeposition. at p. 30.

56. On June 17, 2022, Plaintiff and Connie Ryan and Streck were participating in mediation involving the Bylaw Litigation and the Share Value Litigation and the proposed purchase of Plaintiff and her sons' shares. At the mediation, Streck, referencing its annual Stout valuation represented, at the direction of Connie Ryan, that Streck shares were worth 'just under $27' per share" according to their 2021 valuation they obtained. *See Streck's June 24, 2022, Mediation Statement.* The letter further stated that: "Streck does not have a valuation for fiscal year 2022 and will not have such valuation for several months."

57. Specifically, in the mediation statement given to Stacy Ryan approved by the Streck board and given to Stacy Ryan on June 14, 2022 Streck and Connie Ryan represented that "Streck's fiscal year now ends in June. Streck obtained a valuation from Stout valuing Streck's shares as of end of fiscal year 2021. The valuation valued Streck's shares at just under $27 per share. Using that number, and assuming the share distributed are within the range estimated by Streck, a purchase of Stacy Ryan's shares would total between **$27 million and $30.3 million."** *See Mediation Statement dated June 14, 2022 given to Stacy Ryan attached as Exhibit A.* The letter further stated that: "Streck does not have a valuation for fiscal year 2022 and will not have such valuation for several months."

58. This valuation communicated at that time by Streck through Streck's and FNBO's counsel was false and was discovered by her to be false in 2025 when previously redacted values on Streck's complaint in the Appraisal Rights litigation CI 23-886 (the "Appraisal Litigation") were made publicly available in the form of 12 volumes of Bills of Exception issued upon appeal.

59. In that Appraisal Litigation Streck admits in the complaint that "[S]ince 2019, Streck has received an annual valuation of the enterprise value of its business from Stout Risius Ross, LLC ("Stout"), a global investment bank and advisory firm. Stout valued Streck at $824,000,000 as of June 30, 2019; $940,000,000 as if June 30, 2020; $1,130,000,000 as of June 30, 2021, and $1,270,000,000 as of June 30, 2022." *See paragraph 19 of complaint filed by Streck in the subsequent Appraisal Litigation in Sarpy County District Court CI 23-886) (the "Appraisal Litigation").*

60. When Streck filed their complaint, the above information was redacted. Streck's amended complaint was sealed on May 19, 2023 pursuant to a motion filed by Streck and granted by Judge Cox. It was only because Stacy Ryan's was able review the unredacted 12 Volumes of the Bills of Exception that she could see the actual Stout valuation numbers.

61. Stacy further discovered that Connie and Streck had begun the sale process with Gies before the mediation and had been exchanging Streck's information with Madison Industries for years prior to June 1, 2022, a material fact that would have affected Stacy's decision to engage in mediation with Streck on June 17 and subsequently agree to the Mediation Settlement Memorandum. Stacy also discovered Streck had intentionally misrepresented the 2021 Stout Valuation to her claiming "*The valuation valued Streck's shares at just under $27 per share."* in its June 14 Mediation Statement. The letter further stated that: "Streck does not have a valuation for fiscal year 2022 and will not have such valuation for several months."

62. In a separate e-mail, upon information and belief in coordination with Connie Ryan and Streck, FNBO communicated to Stacy Ryan that it had a valuation that placed the value of Streck shares at $20 a share and that the statements given "contain everything that would be in an accounting." The material content and dates of such e-mail appear below:

-----Original Message-----
From: Stacy Ryan <sar8297@mac.com>
Sent: Wednesday, April 6, 2022 1:54 PM
To: Rosburg, Susan <srosburg@fnni.com>
Subject: [External] Re: Stock restriction Streck

Susan,

As the Trustee administering Mom's trusts please let me know-

1. Have you any updated financial information for/from Streck? Financials , valuations, loan updates or otherwise.
2. Have you been notified of any IRS decision related to the Streck buyout plan?
3. Is the stock restriction you discussed below still in effect or ameded in any way?
4. Does FNB plan to distribute the Eileen Ryan trusts outright to the beneficiaries, free of trust? You previously told me that beneficiaries can choose.
5. Is FNB going to provide an accounting upon distribution?
6. Has FNB informed the court of the incorrect amounts provided to the Court in the case 21- 1286 or does FNB plan to provide the court accurate amounts upon distribution ?
7. 17-355 was dismissed , in what case does FNB plan to administer the Trust?
8. Has FNB been advised that I gave up my share of Mom's trust? By now you should be up to speed in developments in 17-2642. Be advised if you are confused, my share of the cash and stock from Mom's trust is to be distributed to me, same as the other B's.
9. Once you have exited as Trusee, what information do you plan to provide the beneficiaries without a court order?

Please update me on any info I would need to protect my interest in the trust that I may not have asked above because I don't know what I don't know.

Stacy Ryan

**From:** "Rosburg, Susan" <srosburg@fnni.com>
**Date:** April 8, 2022 at 2:47:44 PM CDT
**To:** Stacy Ryan <sar8297@mac.com>
**Subject: RE: Re: Stock restriction Streck**

Stacy -
1. We have no updated financial information from Streck. I have attached an internal valuation prepared for FNBO by RIC. This valuation was prepared for FNBO compliance reporting purposes.

2. No, but we will ask Streck for an update.

3. The stock restriction remains in effect. I have attached a Resolution where Streck modified the restrictions.

4. For the GST Trusts, yes the plan would be to eventually distribute the assets outright to the beneficiaries (except for the beneficiaries who have not attained age 30, which would stay in further trust). For the Marital Trust, the May 2018 Douglas County Court Order orders that FNBO divide the Marital Trust into three subtrusts and to deliver the trust assets to the successor trustees. As we previously stated, unless the Court orders us to deviate from that Order and instead distribute the assets outright to the beneficiaries, or unless all of the Marital Trust beneficiaries agree otherwise, then FNBO intends to follow the mandate in the Court's 2018 Order.

5. The statements you receive contain everything that would be in an accounting. If you want something in another format please let us know.

6. The final distributions would be based on the assets in the Trust at the time of final distribution.

7. I am not aware what you mean 17-355 has been dismissed, that case is still open.

8. We understand that your claim in 17-2642 was settled and that case was dismissed as to you. We are not sure how that case might impact you with respect to the Eileen Ryan Trusts, it is our intention to treat you the same as the other beneficiaries in accordance with the Trust terms, but if there is other information we should be aware of regarding 17-2642 please let us know.

9. That may be depend on whether FNBO distributes the assets to successor trustees under the May 2018 Order, of if another settlement or resolution is reached

Susan K. Rosburg, J.D., AEP®
Director, Wealth Management

OFFICE: 14010 FNB Parkway | Suite 200 | Omaha | NE | 68154
MAILING: 1620 Dodge Street | SC: 8125 | Omaha | NE | 68197
Direct 402.602.3385 | Fax 402.938.5604 I Toll Free 800.538.7298
srosburg@fnni.com | fnbo.com

IMPORTANT NOTICE: The information contained in this electronic transmission and any attachment(s)

63. The valuation given as part of that e-mail was given to please Streck and Connie Ryan, and was not an honest or even diligent assessment of the true value of Stacy's shares. The valuation attached showed a $20.09 value per share and a negative book value, numbers that a sophisticated wealth management department like FNB knew were not accurate.

64. A reasonable Trustee would have asked for the Stout valuations for Stacy. FNB knew that Streck did yearly third-party valuations.

65. No reasonable trustee would have dodged the question by a beneficiary by providing a knowingly inaccurate valuation.

66. FNB acted unreasonably, because they deemed it good for business not to ask too many questions of Connie Ryan and Streck, presumably one of their largest depositors and potential/existing customers.

67. Upon information and belief, FNBO and its Wealth Management department had a spoken/unspoken policy not do anything that would upset Connie Ryan, including asking for information that would have given an accurate valuation of the value of Streck shares or otherwise do anything that would cause shareholders to have access to their shares. This is because at relevant times, Streck and its officers and affiliated persons frequently maintained account balances in the 10s to 100's of millions of dollars in FNB deposit accounts and other accounts and they did not want to lose these customers.

68. Upon information and belief, FNB's wealth department employees were deferential and accommodating to the interests of Streck and Connie Ryan, over the interests of their beneficiaries because it was good business to do so.

69. Both the $27 price per share represented to Stacy in the mediation statement and the $20 per share price claimed by FNBO in a separate e-mail materially

understated the actual known contemporaneous valuation completed by Stout in Streck's actual possession.[12]

70. Streck and Connie Ryan on June 14, 2020 had in their possession the 2021 Stout valuation showing that each share of stock of Streck was actually worth approximately $60 per share as of June 30, 2021 based on the Stout Valuation of $1,130,000,000 dollars as of June 30, 2021, and Streck subsequently admitted this material fact in the Appraisal Litigation. *See paragraph 19 of complaint filed by Streck in the Appraisal Litigation.*

71. Also, during that same time Connie Ryan and Larry Gies were prior to the mediation negotiating a price for the sale of Streck and engaging in "price discovery" on a per share basis on an enterprise value basis with a "floor" of 1.3 billion dollars. *See Pages 106-109 April 24, 2024 Larry Gies deposition.*

72. At the June 17, 2022 mediation Stacy was directly lied to by Connie Ryan about the value of her and her son's shares. Also, Connie Ryan and Streck omitted the fact that as of that date Connie Ryan was invited to the annual Madison Industries Owners Meeting (a meeting she had been invited to go to before) and the reason for going was that Connie Ryan was going to complete a sale of Streck to Madison Industries. Streck and Connie Ryan were in serious negotiations months before the mediation and these negotiations started with proposed per share prices well above $27 and $39 per share.

73. That Mediation Settlement Memorandum also required her to dismiss her claims in the Bylaw Litigation and the Share Value Litigation through and the agreement contemplated the "resolution of pending lawsuits and purchase of all Streck shares owned by or to be distributed to Stacy Ryan and her three sons." See P. 1. Of Mediation Settlement Memorandum. The

---

[12] Steck did not initially share their mediation statement with Plaintiff (as had been previously agreed) until Plaintiff inquired if one existed. After conferring with Steck's board for permission to share it with Stacy, Ms. Buter e-mailed the mediation statement to Plaintiff on June 16, 2022.

Mediation Settlement Memorandum also oddly required that "Stacy and her three sons agree not to buy any Streck Shares in the future or otherwise become a shareholder of Streck." Id. The agreement further contemplated that "the settlement is subject to Streck receiving authorization of the Board" and that "the $38 million will be paid within five (5) business days of the transfer of Streck Shares by the Trustee, First National Bank."

74. The transactions contemplated by the Mediation Settlement Memorandum were not closed at the time it was signed. The agreement was to be closed in the coming months when the shares were released after the board of Streck approved the sale contemplated by the Mediation Settlement Memorandum and after Connie Ryan's litigation in her mother's probate concluded.

75. Despite the fact that Connie Ryan's obligations as a fiduciary imposed upon her a continuing duty to disclose the actual value of her shares (which obligation continues to this date), Connie Ryan and Streck failed to disclose known per share values to Plaintiff. In addition, at the time of mediation and execution of the Mediation Settlement Memorandum that Connie Ryan, Larry Gies, and Streck were actively negotiating a sale of Streck to Madison Industries and exchanging documents with a view towards at least a $61 dollar per share purchase price. Streck, Connie Ryan and the Board also failed to disclose to Plaintiff and Larry Gies were intent on doing "our deal."

76. Connie Ryan needed the Mediation Settlement Memorandum because the Madison Transaction required Plaintiff and her sons' litigation to be resolved. This is confirmed both in the ultimate binding agreements that were signed and in Connie Ryan's own statement on October 17, 2022 that "all the litigation get (sic) be resolved" and that this was "part of Larry's ask." (Recorded Call Transcript, p. 15.). This ask occurred well before the June 17 mediation.

77. Defendants knew in June of 2022 that if Stacy Ryan were fully informed of the material facts Stacy Ryan would have known that the Bylaw Litigation and Share Value Litigation was a significant obstacle to the Madison Transaction. Plaintiff and her sons would never have signed the Mediation Settlement Memorandum on the terms presented if they knew the true value of their Shares and the truth about third party negotiations and valuation discussions.

78. On September 2, 2022 Streck sent a letter to its shareholders concerning the signing of a formal Madison Letter of intent. The letter attached a signed copy of the September 1 Madison Letter of Intent.

79. "A special committee for Streck was formed to evaluate the proposal." *Streck, Inc. v. Ryan, 320 Neb. 638 (2026).*

80. "Gies subsequently raised the offer price to $1.6 billion. Streck signed the letter of intent." Id.

81. On October 6, 2022 "Streck then sent a letter to its shareholders and beneficiaries concerning the pending sale. The letter stated that the transaction would be structured as 'an F reorganization [which] involves creating a new holding company for Streck, merging Streck into a new Delaware limited liability company ('Streck LLC') subsidiary of the holding company and selling the equity interests in Streck LLC to a newly formed subsidiary of Madison.' The letter further stated that the transaction would require the approval of holders of a majority of both the Class A and the Class B common stock." Id.

82. In reality, Streck would not obtain approval of any Class B Common shareholders and Defendants at this time believed they would not be able to obtain such approval.

83. Streck then sought a "Fairness Opinion" of the Madison Transaction from BofA Securities Inc.

84. Apparently believing that the Nebraska Attorney General needed to approve the transaction in November 2022 "Streck provided information about the proposed purchase of Streck by Madison to the Nebraska Attorney General, who has oversight responsibility over the Ryan Foundation" (a major Streck Shareholder). See Appraisal Litigation Complaint paragraph 30.

85. The information included in the packet of information included the November 30, 2022 fairness opinion from BofA Securities, Inc. The same information and letter was not shared with Plaintiff at that time.

86. Unbeknownst to Plaintiff and other Shareholders on December 9, 2022 Streck received an arms-length competing letter of intent from Bio-Rad, a public company offering to purchase Streck for $2,000,000,000.

87. The $2.0 billion price, represented a per-share value of approximately $111.11.

88. Rather than pursuing this offer that would have benefited all shareholders, Defendant Connie Ryan told Bio-Rad "that they could not negotiate." (BOE Vol. III, Ex. 56, Gies Deposition p. 58.).

89. This was false as the Madison Industries' LOI's exclusive negotiating period was about to expire on January 1, 2023. Connie Ryan and Streck had every opportunity to consider the offer.

90. Instead, Streck, Connie and its Board of Directors hid the offer and failed to disclose it to the shareholders by minimizing it in a subsequent disclosure that revealed neither the price offered by Bio-Rad nor who made the offer. See Curtis Akey deposition 180-184.

91. The only mention of the offer (if it can be considered a mention) appears in p. 15 of the information statement given to shareholders on January 24, 2023 after the Board had already allowed Connie Ryan to sell Larry Gies voting shares so that he would be able to vote to the majority of voting shares to approve the Madison Transaction, effectively allowing him to approve whatever transaction he wanted as controlling shareholder of Streck.

92. That "disclosure" given in January 24 merely states that "Streck from time to time also receives formal and informal inquiries from third parties interested in acquiring Streck. Streck received an unsolicited proposal from a competitor of Streck during the exclusivity period in the Madison letter of intent, which prohibited Streck from discussing the proposal with the Competitor. E-8 024. Nevertheless, the Special Committee and the Board determined that the Madison offer was superior to the other offer for a number of reasons. Among other factors, the Special Committee and Board considered the other proposal to be speculative due to the failure of the competitor to perform any financial or other due diligence prior to submitting the proposal, and after seeking advice regarding the antitrust implications of the proposal, determined that the transaction with the competitor would likely be significantly delayed by antitrust review by federal regulators. A prolonged antitrust review could prevent the transaction from being consummated on the terms proposed by the competitor or at all. In addition, the uncertainties resulting from a prolonged antitrust review could damage Streck's relationships with its customers, suppliers, and employees." P. 15 January 24, 2023.

93. No substantive antitrust analysis was completed by the Special Committee, the Board, or its officers and reasons given for not pursuing the offer were a pretext to avoid disappointing Connie Ryan's and now controlling Shareholder Larry Gies goal to close "our deal" at all costs.

94. The exclusivity period for the Madison LOI had already expired as of January 1, 2023[13] and Streck was free to pursue and consider the Bio-Rad LOI with a 25% higher value than the Madison Transaction or to find any other suitors and consider any other alternative.

95. Even if there were actual true barriers (anti-trust, customer expectations etc.) Connie Ryan, Larry Gies, and the Board created a fictional bi-lateral "Sophie's choice" – sell to Madison, and take $400,000,000 less, or take Bio-Rad up on their offer and have the transaction be nixed by anti-trust rules and/or endure years of negotiations with regulators and customers. The world of finance and mergers and acquisitions is not two-dimensional. The Defendants (the most sophisticated business persons of their type) <u>knew</u> that they could have engaged an investment banker to find a buyer to pay $2,000,000,000 or more who did not have antitrust issues or create customer issues.

96. Connie Ryan, Larry Gies, and the Board could have kept the business and continued to generate cash for the shareholders. They could have engaged an investment banker to take Streck public, creating both liquidity and the opportunity for Connie or another shareholders to keep a controlling interest while cashing out the shareholders who were not interested in being stuck in a closely held business. Instead, they let Connie Ryan and Larry Gies solve a fake "dilemma" and by allowing Connie to sell Larrry Gies a majority voting interest so Larry Gies could made sure he could force the asset sale. How convenient for Larry and Connie. This is exactly what the plan was to do. The discussions about anti-trust and customer wishes were a shiny object for the unsophisticated stakeholders to look at while the real work of getting to the closing of "our deal" was getting done.

[13] See E-4 113-115.

97. Knowing that they needed to "lock in" the Madison Transaction because there was no binding documents signed as of yet, Connie Ryan and Larry Gies decided that Larry Gies should obtain voting control to ensure that he could vote a majority of the voting shares in favor of the transaction. See E-5 107 – 110.

98. Thus, on December 21, 2022, Connie Ryan sold Larry Gies 196,850 Class A voting shares and agrees to sell additional 196,850 shares at subsequent closing so that he could use those shares to force a sale to Madison as contemplated by the Letter of Intent. E-10 160.

99. To facilitate that "lock in" the Streck Board on December 21, 2022 met with Larry Giesin a special meeting to consider whether the Board Corporation should exercise its Right of First Refusal. Id.

100. Instead of exercising the right of First Refusal, the board chose to allow Larry Gies to place himself on both sides of the Madison Transaction by purchasing Connie Ryan's Streck voting shares. The Board in its resolution found that "it is not in the best interests of [Streck] that the corporation exercise its right of first refusal in connection with the Connie Ryan-Larry Gies Proposed Transfer." *December 21, 2022 Resolutions of the Streck Board of Directors.*

101. The "first battle" was over and Larry Gies and Connie Ryan's deal was sealed. They then exchanged a self-serving celebratory e-mail, that nonetheless constitutes and admission that getting the Board to allow Larry Gies to be on both sides of the transaction was always the real goal. Larry Gies was the controlling shareholder, and no one could stop him doing their asset deal. E5- 108.

On Jan 23, 2023, at 11:54 AM, Constance Ryan <CRyan@streck.com> wrote:

I know I felt similarly until I thought about the timing of this offer, the words he used in his conversation with me, why this would absolutely destroy Streck's hematology business. I always think controlling the conversation is better with this group then letting them control. We all ready won the first battle. You are the controlling shareholder, we can do this asset deal.
Connie

<image001.jpg> **Constance Ryan** CEO & Chairperson
Direct 402-691-7438 | Main 800-843-0912
CRyan@Streck.com
streck.com
<image002.png> <image003.png> <image004.png>

**From:** Larry Gies <lgies@madison.net>
**Sent:** Monday, January 23, 2023 1:51 PM
**To:** Constance Ryan <CRyan@Streck.com>
**Subject:** Re: Project Owl/Information Statement

Great points. Let me think about it for a few minutes.

Larry Gies

102. On December 30, 2022, apparently unaware that a $2 billion offer was being pretextually disregarded as "speculative" and "not considered" because of a false exclusivity period, and unaware that Larry Gies had put himself in position to vote in favor of a transaction with an entity he controlled (Madison Industries) the Nebraska Attorney General sent a letter stating that it believed the Madison Transaction was in the best interests of the Ryan Foundation.

103. As promised, on January 5, 2023 Larry Gies purchased the 196,850 shares of Streck's Class A stock from Connie Ryan at $70.08 per share. "This made Gies the controlling shareholder of Streck." Ex-11 210. Gies also agreed to purchase majority of Class B nonvoting shares held by Connie and her children at the same price of $70.08 per share.

104. Larry Gies, as enabled by Connie Ryan, was thus in position to close his purchase by forcing a sale to Madison Industries. Connie Ryan, as CEO, abided with his request and caused the transaction to be restructured as an asset sale and assembled her board to approve the new structure and recommend it be approved by the voting shareholders of Streck, Connie Ryan and Larry Gies. Larry Gies was also in position to use his voting control to vote out any board members who might demand he demonstrate to Streck that the Madison Transaction was fair to the shareholders and/or who might require Madison Industries (of which he was the controlling shareholder) to match or bid against the $2 Billion dollar Bio-Rad offer.

105. Thus, by January of 2023, the Streck Board, Connie, Larry, and FNBO (who fully supported the Madison Transaction), knowing that it was never going to get approval of the Class B Common Stock pivoted to a transaction which could be approved by vote of the Class A voting shares which were held only by Connie Ryan and Larry Gies (other than a nominal owned by Carol Ryan and Steve Ryan).

106. Accordingly, the transaction was restructured as disposition of assets because Defendants knew they would be unable to obtain non-voting shareholder approval. "Streck would first transfer substantially all of its assets and liabilities to 'Streck LLC.' Then, Streck would sell the equity of Streck LLC to a subsidiary of Madison Technologies Holdings LLC. Lastly, Streck would distribute the proceeds it received and other cash to its shareholders." *Streck, Inc. v. Ryan*, 320 Neb. 638 at 642 (Jan. 9, 2026).

107. "On January 20, 2023, Streck held a Special Board of Directors meeting, the purpose of which was to discuss the [restructured] transaction and determine whether the Transaction should be approved." *Id.*

108. At that meeting "Streck's Board of Directors unanimously voted to approve the Transaction, determining that it was in the best interests of

Streck and its Shareholders despite knowing that they had just pretextually disregarded a 25% higher offer and allowed Larry Gies by then the controlling shareholder to vote to approve his insider deal (previously having voted to allow him to acquire a majority of the voting shares of Streck). *Appraisal Litigation Complaint paragraph 35.*

109. "Following Board approval, on January 24, 2023, Streck provided a Notice of Special Shareholders Meeting, Information Statement, and related materials to Streck's shareholders and the beneficiaries of Streck shares. The information Statement advised Streck's shareholders that a special shareholder meeting would take place on February 3, 2023, at which the Class A voting shareholders would be asked to approve the Madison Transaction." *Appraisal Litigation Complaint paragraph 39.*

110. Thus, at this time the Board, like Larry Gies, had "locked in" the Madison Transaction.

111. The January 24 Notice claimed that "all of Streck's shareholder were offered a "Reinvestment Option" pursuant to which they could roll over a portion of the proceeds they received for their Streck equity into equity interests in the entity that would be formed by the Transaction. E-4 120-143.

112. That disclosure omitted to state, however, that Connie Ryan and Streck had no intent to allow Plaintiff or her sons to participate in the Transaction and intended to hold them to their fraudulently induced obligations under the Mediation Settlement Memorandum as a way to get Plaintiff and her sons to dismiss their Bylaw Litigation and their Shareholder Litigation (both a condition of closing the Madison Transaction).

113. In contrast to her earlier representation that Connie Ryan would not be rolling over into the Madison Transaction, the January 24, 2023 disclosure revealed the truth because it revealed that Connie Ryan and her children

Defendants Matt Kreifels and Carrie Kreifels were rolling over $41,500,000 into the Madison Transaction. P. 19 of the January 24 information statement for the first time revealed: "Connie Ryan, the Chairperson and Chief Executive and a director of Streck, Direct Seller, and DS Intermediate, has elected to exercise the Reinvestment Option and will reinvest $40,000,000 or approximately 15.93%, of her expected liquidation proceeds. Carrie Kriefels has also elected to exercise the Reinvestment Option and will reinvest $1,500,000, or approximately 11.08% of her expected liquidation proceeds. As a result of their election to exercise the Reinvestment Option, [Connie] Ryan, [Matt] Kreifels, and [Carrie] Kreifels will have continuing economic interests in [Streck] following the consummation of the transactions. As set forth above in "Description of the Transactions – Reinvestment Option" each shareholder of Streck has the opportunity to exercise the Reinvestment Option. E-11 023

114. All the above information was withheld until Plaintiff was powerless to question or even demand the directors not allow the closing of "our deal" because by then Larry Gies had been intentionally put into position to be able to cause the closing.

115. The last sentence of that disclosure was false because Connie Ryan and Streck, through settlement fraud, made Stacy Ryan and her sons agree not to become shareholders after they signed the Mediation Settlement Memorandum and later the Confidential Settlement Agreement and effectively banned them from exercising the Reinvestment Option. Little did Stacy Ryan and her sons know, Connie Ryan was planning to sell Streck and make a lucrative investment for herself in the rollover entity.

116. They did so by threatening to enforce the Mediation Settlement Memorandum's sale price of $39 per share against Plaintiff and her sons.

117. The reason they did this was so they could close the Madison Transaction by making Plaintiff and her sons agree to dismiss the Share Value Litigation and the Bylaw Litigation, a key condition for closing the February 10 Madison Transaction documents.

118. Connie Ryan, as part of the Madison Transaction Connie Ryan's long term incentive bonus agreements and Matt Kreifels's new employment agreement and phantom stock agreement would "continue in effect after the closing of the transactions". *Ex-11 033.*

119. The Madison Transaction could not close without Plaintiff's agreement to dismiss the Share Value Litigation and Bylaw Litigation. Section 5.6 of the Securities Purchase Agreement subsequently signed by Streck and Madison Industries affiliate on February 10, required as a condition of closing that there be no "Proceedings" pending or threatened against Streck. The Agreement defined "Proceedings" to include any lawsuit. The Bylaw Litigation and Share Value Litigation were Proceedings that would prevent Closing. Madison, its investment bankers, and its insurance partners would not have closed the $1.6 billion Transaction with this litigation pending. Ex-11 068.

120. Defendants knew that if Plaintiff had been fully had been informed of the material facts Defendants failed to disclose that the Bylaw Litigation and Share Value Litigation would be an obstacle to a $1.6 billion transaction and that had Plaintiff and her sons known Connie Ryan was in active negotiations with Larry Gies before the Mediation took place she would never have signed the Mediation Settlement Memorandum or the subsequent Confidential Settlement Agreement on the terms presented.

121. If Plaintiff and her sons had known their true leverage, they could have: (a) refused to agree to release claims and blocked the Transaction entirely, retained, by rolling over, shares in a company worth $2 billion or

more; (b) demanded that Streck settle the Share Value Litigation and the Bylaw Litigation for full value as a condition of her agreeing to release those claims; or (c) exercised the rollover option to retain equity in the ongoing business while separately negotiating the resolution of the Bylaw Litigation and the Share Value Litigation for additional consideration.

122. Instead, Connie Ryan, Larry Gies and Streck dissipated any leverage by falsely threatening that Streck could and would hold Plaintiff to the $39 per share purchase price established by the Mediation Settlement Agreement. They did this, despite their declaration to the shareholders that all shareholders would be treated the same in the Madison Transaction by receiving the same price and by pressing their advantage of having earlier caused Plaintiff and her sons to sign the Mediation Settlement Memorandum (as a result of misrepresenting Streck's value at $27 per share).

123. This was accomplished through a series of e-mails from Streck Counsel on behalf of Streck, the result of which was to treat Stacy Ryan and the Coffey Children's Trust entirely different than how the other shareholders were to be treated in the Madison Transaction.

124. Knowing that Streck would need to have Stacy Ryan continue to agree to dismiss the Bylaw Litigation and the Share Value Litigation in order to close the Madison Transaction, Streck decided to falsely appear magnanimous.

On Sep 7, 2022, at 9:37 AM, Buter, Vicki H.
<Vicki.Buter@KutakRock.com> wrote:

Stacy:

If you have not already, you will be receiving correspondence soon indicating that Streck has signed a non-binding letter of intent to sell Streck to Madison Industries for not less than $1.3 billion.

Streck's position remains that it has a binding settlement with you and your sons. However, we wanted to let you know that, in the event this sale takes place, which is Streck's intent, you and your sons will receive the difference between the amount for which Streck agreed to purchase your shares pursuant to the settlement agreement and the share price that would be received by the sale. The remaining terms of the settlement would stand.

**Once you have had a chance to review the inforamtion, we can discuss further.**

Thanks,

Vicki

**Victoria H. Buter** | Partner | **Kutak Rock LLP**
1650 Farnam Street, Omaha, NE 68102-2186
**D** (402) 231-8875 | **O** (402) 346-6000 | **C** (712) 309-5101
Vicki.Buter@KutakRock.com | www.KutakRock.com

125. The "binding settlement" in the form of the Mediation Settlement Memorandum settlement was obtained using fraud and is void, but even knowing this Streck and Connie Ryan still continued to claim it was binding to avoid Plaintiff's rescinding their Agreement get Plaintiff to continue to agree to dismiss the Bylaw Litigation and the Share Value Litigation, both conditions of closing the Madison Transaction.

126. Stacy Ryan pointed out the dichotomy in a subsequent e-mail, but Connie Ryan and Streck continued to demand that Stacy Ryan and the Coffey Children's Trust be treated entirely different than the other Shareholders were being treated because they knew that if they told Stacy the agreement to dismiss the Bylaw Litigation and the Share Value

Litigation would have upheld the Madison Transaction, she would not sign the subsequent Confidential Settlement Agreement.

> On Oct 28, 2022, at 9:11 AM, Buter, Vicki H.
> <Vicki.Buter@kutakrock.com> wrote:
>
> Stacy - the sale process is moving forward. We have been working with others to obtain some resolution. We should have a final settlement agreement to you next week. I will ask Dale if we have any information on the process we can report at this stage.
>
> Thanks,
>
> Vicki
>
> ---
>
> **From:** Stacy Ryan <sar8297@me.com>
> **Sent:** Friday, October 28, 2022 6:26:29 AM
> **To:** Connie Ryan <cryan@streck.com>; Buter, Vicki H.
> <Vicki.Buter@KutakRock.com>
> **Subject:** Streck
>
> [ CAUTION - EXTERNAL SENDER ]
>
> Be nice if somebody would tell me what's going on.
>
> It's curious to me that I'm a shareholder if I'm suing you and you want a stock restriction but I'm not a shareholder if you don't want to tell me what's going on and when you don't invite me to your shareholder meeting.
>
> Connie last advised that I consult my financial advisors, how do I do that when I don't know what's going on ?
>
> Sent from my IPhone
>
> ---
>
> This E-mail message is confidential, is intended only for the named

127. Again, on November 18 Streck continued to take the position that they had a valid settlement agreement to compel Stacy Ryan and the Coffey Children's Trust to be treated differently than the other shareholders in the pending Madison Transaction. By this time other shareholders had made it clear they were not happy with the price, had been provided a second Stout valuation and this information was not shared with Stacy. At this time Streck and Connie Ryan had the obligation and opportunity to tell the truth about the true value of Streck, but they did not for the purpose of obtaining the release of Plaintiff's Shareholder Value Litigation and the Bylaw Litigation.

> On Nov 18, 2022, at 8:41 AM, Buter, Vicki H. <Vicki.Buter@kutakrock.com> wrote:
>
> Stacy:
>
> As you know, Streck has resolved its litigation with you. We have been working to resolve the other litigation in which Streck is involved and Connie Ryan has been doing the same through her attorney and we have been communicating about those issues.
>
> Do you have time for a call this afternoon and we can update you generally? Dale and I are free between 2pm and 4pm.
>
> Thanks,
>
> Vicki
>
> Victoria H. Buter I Partner I Kutak Rock LLP
> 1650 Farnam Street, Omaha, NE 68102-2186 D (402) 231-8875 I O (402)
> 346-6000 I C (712) 309-5101 Vicki.Buter@KutakRock.com I
> www.KutakRock.com
>
> -----Original Message-----
> From: Stacy Ryan <sar8297@me.com>
> Sent: Friday, November 18, 2022 8:04 AM
> To: Buter, Vicki H. <Vicki.Buter@KutakRock.com>
> Subject: Streck sale
>
> [ CAUTION - EXTERNAL SENDER ]
>
> Ms Buter,
>
> What is the status of your efforts to "resolve family litigation ? "
>
> Don't tell me you are working on it because it appears to this family member you aren't.
>
> What / who exactly is the problem?

128. On December 8, Connie Ryan and Streck, through counsel, continued to press that they were going to hold Stacy Ryan and her sons to the deal that they obtained through settlement fraud writing:

**From:** Buter, Vicki H. Vicki.Buter@KutakRock.com
**Subject:** RE: Streck correspondence
**Date:** December 8, 2022 at 11:51 AM
**To:** Stacy Ryan sar8297@mac.com
**Cc:** Dahlk, Thomas H. Tom.Dahlk@KutakRock.com, Dixon, H. Dale Dale.Dixon@KutakRock.com, Constance Ryan cryan@streck.com

VB

Stacy:

If you wish to move to compel the settlement, it will at the figure agreed to at the mediation - $38 milion for the purchase of all of the share to be distributed to you and your sons from the Eileen Ryan Trust, and any other shares owned or to be owned by you, as set forth in the term sheet.

We had offered in the email below that, ***if the sale goes through***, Streck would give you the higher price. However, if the sale does not go through, our settlement stands at the number agreed to at the mediation. That was clearly set out in the email below.

Streck acted in good faith in waiting to finalize the settlement to allow you the potential benefit of a higher number.

If you would like to finalize the settlement at $38 million for the purchase of all your shares and those of your three sons, please advise and we will endeavor to do so.

Vicki

**Victoria H. Buter** | Partner | **Kutak Rock LLP**
1650 Farnam Street, Omaha, NE 68102-2186
**D** (402) 231-8875 | **O** (402) 346-6000 | **C** (712) 309-5101
Vicki.Buter@KutakRock.com | www.KutakRock.com

---

**From:** Stacy Ryan <sar8297@mac.com>
**Sent:** Thursday, December 8, 2022 11:45 AM
**To:** Buter, Vicki H. <Vicki.Buter@KutakRock.com>
**Cc:** Dahlk, Thomas H. <Tom.Dahlk@KutakRock.com>; Dixon, H. Dale <Dale.Dixon@KutakRock.com>; Constance Ryan <cryan@streck.com>
**Subject:** Re: Streck correspondence

**[ CAUTION - EXTERNAL SENDER ]**

Good Morning,

The attached Motion to Compel will be filed at 2PM. If Streck would like to cooperate and respond or promptly (today) memorialize the offer and have it signed by Streck, preferably by CEO Connie Ryan, we can avoid a hearing. Please let me know by 2PM.

Thanks,

Stacy Ryan

129. Plaintiff and her sons were again threatened on January 10 and January 26 that they would be held to a lower price.

**From:** Buter, Vicki H. Vicki.Buter@KutakRock.com
**Subject:** RE: in light of Connie's letter to me-
**Date:** January 10, 2023 at 10:09 AM
**To:** Stacy Ryan sar8297@me.com, Constance Ryan cryan@streck.com, Dahlk, Thomas H. Tom.Dahlk@KutakRock.com

Stacy:

The price for your shares depends upon whether a transaction with Madison occurs. We understand you should be receiving a communication from Madison this week. Perhaps it makes the most sense to wait until you receive that, then we can talk about formalizing the settlement agreement.

Thanks,

Vicki

**Victoria H. Buter** | Partner | **Kutak Rock LLP**
1650 Farnam Street, Omaha, NE 68102-2186
D (402) 231-8875 | O (402) 346-6000 | C (712) 309-5101
Vicki.Buter@KutakRock.com | www.KutakRock.com

**From:** Buter, Vicki H. Vicki.Buter@KutakRock.com
**Subject:** Streck - settlement
**Date:** January 26, 2023 at 2:44 PM
**To:** Stacy Ryan sar8297@me.com
**Cc:** Dahlk, Thomas H. Tom.Dahlk@KutakRock.com

Stacy:

I understand you received the Information Statement this week from Streck regarding a sale transaction under a different structure. With regard to Streck's settlement with you and your three sons, we propose the following:

- If the Madison transaction goes through, you and your sons will receive the approximately $70 per share (instead of the lower amount in our current settlement agreement)
- The remainder of the terms of the settlement will remain the same – releases, dismissal of litigation, etc.
- We can update the current agreement to reflect how the share purchase will work
- We can postpone the hearing before Judge Bataillon currently scheduled for Monday until after the transaction closes, which we hope to be mid-February if all goes according to plan
- If the transaction with Madison does not go through, prior settlement terms remain

The bailiff also sent the attached email regarding the hearing Monday. Let us know as soon as you can your thoughts on postponing that so we can get back to him.

Thanks,

Vicki

**Victoria H. Buter** | Partner | **Kutak Rock LLP**
1650 Farnam Street, Omaha, NE 68102-2186
D (402) 231-8875 | O (402) 346-6000 | C (712) 309-5101
Vicki.Buter@KutakRock.com | www.KutakRock.com

This E-mail message is confidential, is intended only for the named recipients above and may contain information that is privileged, attorney work product or otherwise protected by applicable law. If you have received this message in error, please notify the sender at 402-346-6000 and delete this E-mail message.
Thank you.

Mail Attachment.eml
10 KB

130. Connie Ryan and Streck's threats caused Plaintiff and her sons to execute a different deal than the other shareholders ended up receiving as

part of the Madison Transaction. On February 20, 2023 Stacy signed another agreement (the "Confidential Settlement Agreement") between Streck as purchaser and Stacy Ryan and the Coffey Children's Trust as Sellers.

131. The Confidential Settlement Agreement, like the Mediation Settlement Memorandum before it, required that Stacy and the Coffey Children's Trust agree to "dismiss the litigation against Streck in the District Court of Sarpy County Nebraska, captioned Stacy Ryan v. Streck, Inc. Case No. CI19-549" and "not oppose the summary judgment motion filed by Streck and currently pending against Streck and its Board of Directors in the District Court of Douglas County, Nebraska, captioned Stacy Ryan et al. v. Streck Inc. and its Board of Directors" to "agree that they will not purchase any Streck shares in the future or otherwise become a shareholder of Streck through the transfer of shares, gift of shares, or otherwise" and to generally "forever release and discharge[] Streck, and its past, present and future parents, subsidiaries, affiliates partners …" etc. *See Confidential Settlement Agreement p. 2-8.*

132. Plaintiff and her sons were treated differently than the other shareholders and threatened with a lower price because Larry Gies and Connie Ryan wanted to keep "our deal" at all costs even through under Nebraska Law *Shareholders in a close corporation owe one another the same fiduciary duty as that owed by one partner to another in a partnership."* and *"Partners must exercise the utmost good faith in all their dealings with the members of the firm and must always act for the common benefit of all.". Noel v. Pathology Medical Services*, 320 Neb. 92 (2025),

133. Larry Gies chose to intentionally ignore the longstanding obligation of controlling shareholders to act as fiduciaries to non-controlling shareholders wrongfully believing that his sole responsibility was to Madison because When asked about his duty to minority shareholders, Gies deflected responsibility:

*Q: "What did you do in your capacity as the majority voting shareholder to assure that the nonvoting shareholders, including a charitable foundation, got the best price?"*

*A: "**That was up to the board of the company… My responsibility was at Madison.**" See Larry Gies deposition.* E-3 081.

134. Larry Gies and Connie Ryan also chose to ignore their fiduciary duties when it came to competing higher offers that would interfere with the deal that benefited Madison and Connie over the other shareholders of Streck. They had no interest in even considering an LOI which offered to purchase Streck for $2 Billion dollars, $400,000,000 more than the Madison Offer.

135. This is because Gies testified that Connie Ryan actively blocked negotiations with Bio-Rad: *Q: "Did anyone at any time tell you that Bio-Rad withdrew its December 9, 2022, letter of intent?" A: "My understanding was that Bio-Rad was told that they could not negotiate with them, that Streck, the company, **could not negotiate with Bio-Rad.**" "Who told you that?" A: "Connie."*

**From:** Constance Ryan [CRyan@Streck.com]
**Sent:** 6/20/2022 5:25:05 PM
**To:** Bill Fairfield [bill@gmswerks.com]; Bill Gerber (William.Gerber@btn-inc.com) [William.Gerber@btn-inc.com]; Gary Gates (gpg440@gmail.com) [gpg440@gmail.com]; Lisa Roskens [lroskens@burlingtoncapital.com]; Sue Thaden [sthaden@clientresourcesinc.com]; Constance Ryan [CRyan@Streck.com]; Jack Becker [jbecker@joslyn.org]; Mike Cassling [mcassling@cquencehealth.com]
**Subject:** Fw: Scorecard and Sales Analysis for the Board - May FY2022
**Attachments:** Scorecard and Sales Analysis - FY22 May.pdf

In May we were under forecast by $660,000. This was due to BCT being under forecast. YTD sales are $199.34M, $5.4M over forecast.
The products primarily contributing to over forecast are BCT, hematology, flow cytometry, and Sickle Cell test.
Sales continue to be strong. We are considering a financial partnership with Ceres who makes the hydrogels we have incorporated into a product to be released this summer.
June will be our final month for F'22 and Sales have been strong.
In the past couple of months we have lost three executives HR Director, IT Director, and Marketing Director. We are close to hiring a new HR Director. My goal is to hire talent and skill. Our Marketing Director is a long saga and we are working with Kutak to resolve.
These steps are to prepare us for growth and a plan for the future. I will be going to Madison Industries CEO Day. It is one of the largest private companies in the US. Using the Berkshire model, but staying private, he only buys companies that make a difference in our lives. So he has a medical division. The CEO is Larry Gies. Please look at the web site. I have known Larry for years and he recently called an invited me to the CEO Day. I think there is a possibility this could be the best place for Streck.
I look forward to discussing my time there and your thoughts at our next board meeting.
We have been getting great publicity on the apartments and we are ahead of schedule! Hopefully will open early 2023!
Lastly we have reached an agreement to purchase Stacy Ryan and her three sons shares. This will also settle the lawsuits Stacy has flied about the bylaws and her shares gifted through her parents GRAT. The case against Steve Ryan will remain open and my personal attorney, Damien, will file that she was given a settlement from the estate and that a settlement to one, means a settlement for all. Hopefully I will receive and possibly the Supreme Court understands what my brother has done to gain control of my father and his estate and more changs will result.
Any questions, let me know.
Connie

136. The sole focus of Connie Ryan and Larry Gies was to protect "our deal" at all costs. This is because at the time of this e-mail to the board, just three days after the mediation with Plaintiff Connie was already scheming with Larry Gies how they would structure the transaction to sell Streck to themselves.

Message

From: Larry Gies [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=50209E2CD8D147A19802D7C913605449-LGIES]
Sent: 1/23/2023 2:04:53 PM
To: Constance Ryan [CRyan@streck.com]
Subject: Re: Project Owl/Information Statement

Agree. U r spot on Connie. Bogus offer that would never happen.

Larry Gies
**MADISON INDUSTRIES**
*making the world safer healthier & more productive* www.madison.net

On Jan 23, 2023, at 12:01 PM, Constance Ryan <CRyan@streck.com> wrote:

Thanks. I know it's the right thing to do to protect our deal.
Connie

<image001.jpg>

**Constance Ryan** CEO & Chairperson
Direct 402-691-7438 | Main 800-843-0912
CRyan@Streck.com
streck.com

<image002.png> <image003.png> <image004.png>

**From:** Larry Gies <lgies@madison.net>
**Sent:** Monday, January 23, 2023 1:58 PM
**To:** Constance Ryan <CRyan@Streck.com>
**Subject:** Re: Project Owl/Information Statement

You are right. It's just a bogus offer and makes me mad they did this because it's not real. They would have destroyed the business over the coming year of antitrust review (assuming deal even got that far) and then abandoned the deal – horrible. Agree with you.

Larry Gies
**MADISON INDUSTRIES**
*making the world safer healthier & more productive* www.madison.net

EXHIBIT

137. At no relevant time did Connie let anyone know that she was actually participating in the deal by rolling her shares over (the opposite of what she told her fellow shareholders in the October 17 meeting). This is because when the Rollover was disclosed on January 24, 2023 the deal was already "locked in" as a result of Gies acquiring a majority voting stake in Streck.

138. Larry Gies admits in sworn testimony that he engaged in self-dealing. In his deposition, Gies was asked directly about the conflicting interests between the shareholders and his company, Madison Industries:

*Q: "As a majority shareholder of Streck and as the controlling party at Madison, was it worth more dollars to you to sell Streck for $2 billion or to buy Streck for $1.6 billion?"*

*A: "Me personally? If I could sell it for $2 billion personally and all of the facts and circumstances were exactly the same as the 1.6, **I probably could have made more personally.**" P. 86 Gies Deposition. E-3 082.*

139. The Board of Directors and controlling shareholders breached their fiduciary duties by failing to give any meaningful consideration to alternatives to the Madison Transaction.

140. The Board failed to consider the obvious option of not selling Streck at all. Streck was a profitable, growing company with strong market position. There was no financial necessity requiring a sale.

141. Instead, the Board determined to sell because they were "tired" of family litigation. This rationale was a plain breach of fiduciary duty. The costs of family litigation were nominal compared to the value the Board gave away to Larry Gies and Connie Ryan by selling at $1.6 billion rather than $2.0 billion or not selling at all.

142. The Board authorized and recommended to the voting shareholders the closing of the Transaction through a Securities Purchase Agreement on February 10, 2023 without giving any meaningful consideration to: (a) the $400 million higher offer from Bio-Rad; (b) whether to sell Streck at all; or (c) whether the transaction was fair to minority shareholders who would be cashed out while Connie Ryan and her children retained equity participation.

143. Director W. Gary Gates testified that there was "no agenda item" for antitrust analysis of the Bio-Rad offer and that the Board never asked Madison to match Bio-Rad's price. E-7 087. The Board's dismissal of a $400

million higher offer without meaningful analysis was a breach of fiduciary duty.

144. At all relevant times, FNB served as Trustee of the Eileen Ryan Marital Trust, which held Streck shares for the benefit of Stacy Ryan.

145. As a professional corporate trustee, FNB had access to information about Streck's value and the Madison Transaction. FNB's counsel communicated with Streck's counsel and Madison's counsel regarding tax matters related to the Transaction.

146. FNB could have obtained the existing Streck valuations or even completed their own bona fide valuation. FNB knew or should have known that Streck was concealing material valuation information from its beneficiary Stacy Ryan and actually participated in that deceit by providing an irrelevant valuation and ignoring a legitimate request for actually useful information it could have obtained, but did not because of its business relationship with Streck, Inc.

147. Rather than fulfilling its fiduciary duty to obtain accurate valuation information for its beneficiary, FNB provided Stacy Ryan with an "in house valuation" of $20.00 per share a figure that was materially lower than even the fake $27 figure Streck was representing.

148. FNB failed to failed to make recommendations to the Streck to reconsider the Transaction despite knowing that the Transaction was structured specifically to deny appraisal rights to nonvoting shareholders and to potentially allow Larry Giesand Connie Ryan to extract $400,000,000 or more in value from Streck that could have otherwise benefited all shareholders.

149. FNB's failures directly facilitated Streck's fraud against Stacy Ryan.

150. The fraud perpetrated in February 2023 was consistent with Streck's pattern of concealing valuations to underpay shareholders.

151. In 2012, Streck concealed the July 2012 JVA valuation showing higher share values to pay Stacy Ryan based on a lower 2011 valuation.

152. In 2022-2023, Streck concealed and witheld the Stout valuations to induce Plaintiff and her sons to settle based on the outdated June 2021 representation that the Stout report stated that an approximately $27 per share value.

153. Streck, through its officers Connie Ryan and Akey, deliberately structured the Madison Transaction as an asset sale to benefit Connie Ryan and her two children and to deny nonvoting shareholders like Plaintiff and her sons a fair price.

154. Plaintiff and her sons did not and could not have discovered the fraud until she discovered the unredacted Bill of Exceptions in the Appraisal Case which contained the actual Stout valuations in paragraph 18 of the complaint filed in that case (along with unredacted bank account information and transaction information that the February 20, 2023 Confidential Settlement Agreement was supposed to keep confidential. Moreover, to this date under applicable law Defendants have an affirmative obligation to correct the false statements they have made about the value of Streck.

155. In September 2024, Streck provided a dissolution notice to shareholders. The notice indicated that claims against Streck must be filed within three years of the notice date. The claims in this complaint are within that period.

156. Stacy Ryan has not dismissed the Sarpy County Litigation (CI19-548) because she believes the Confidential Settlement Agreement requiring such dismissal was procured by fraud. Accordingly, CI19-548 remains pending.

157. In addition, this case has not been dismissed because Streck has not fully distributed to the shareholders the assets of Streck, Inc. and Streck Inc., and previous request by Plaintiff to FNBO and Streck to provide an accounting of all funds it has handled from the Madison Sale (which FNBO and Streck have a statutory obligation to undertake) remains unfulfilled.

158. By signing the Confidential Settlement Agreement, Plaintiff surrendered:

a. Share Value Litigation claims, which involve correctly valuing approximately 2,700,000 nonvoting shares and 5,500 voting shares;

b. The opportunity to block or delay the Transaction until adequately compensated;

c. The right to participate in the ongoing equity value that Connie Ryan and Larry Gies retained through their rollover;

d. The right to continue to pursue the Bylaw Litigation.

159. Defendants received the benefit of Plaintiff and her sons agreement to release her claims in the Share Value Litigation and the Bylaw Litigation which was a contractual condition of closing the Madison Transaction while paying Plaintiff and her sons a fraction of what they were entitled to receive.

160. The February 2023 Settlement Agreement contained mutual confidentiality provisions requiring the parties to maintain the confidentiality of the Agreement's terms and related personal information. Defendants materially breached these provisions when they permitted the Bill of Exceptions—containing Stacy Ryan's and the Coffey children’s bank

account information—to be filed as a public record in the Sarpy County District Court.

161. This breach provides an independent basis for rescission of the Confidential Settlement Agreement under Nebraska law. A party to a contract who materially breaches its terms cannot enforce that contract against the non-breaching party. See Restatement (Second) of Contracts § 237. Here, Defendants' careless disclosure of Plaintiff's most sensitive personal transaction information—and bank account details—constitutes a material breach entitling Plaintiff to rescind the Agreement regardless of the fraud claims.

162. The irony is not lost: Defendants concealed from Plaintiff and her sons the very information and material facts she needed to make an informed decision and now are broadcasting to the public the very information Streck promised would remain confidential (her banking information and funds paid to her). The Defendants cloddishly managed to be both deceptive and negligent in the same transaction—concealing what should have been disclosed while disclosing what should have been protected.

163. This conduct demonstrates Defendants' utter disregard for their contractual obligations and Plaintiff's rights. Even setting aside the breach of fiduciary duty, fraud, and securities fraud, Plaintiff and her sons are entitled to rescission based solely on Defendants' material breach of the confidentiality provisions they themselves demanded.

## COUNT 1

## SECURITIES FRAUD IN VIOLATION OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT OF 1934 AND SEC RULE 10b-5

*(Against All Defendants)*

164. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

**A. Statutory and Regulatory Framework**

165. Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), makes it unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, "[t]o use or employ, in connection with the purchase or sale of any security" any "manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."

166. SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, implements Section 10(b) by prohibiting, in connection with the purchase or sale of any security, (a) the employment of any device, scheme, or artifice to defraud; (b) the making of any untrue statement of a material fact or the omission of a material fact necessary in order to make statements made not misleading; or (c) engaging in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

167. Defendants will attempt to attack Plaintiff's 10b-5 federal claims and state law securities claims with that they are barred by the Confidential Settlement Agreement's merger clause. It states that "this Agreement constitutes and memorializes the entire agreement between the Parties" and that "[t]here are no representations, promises, agreements, or undertakings between the Parties other than those set forth set forth expressly in this Agreement, and neither Party is relying on any such representation, promise, agreement or undertaking."

168. This attack fails as to all claims, although the reasoning with respect to Plaintiff's securities claims is different from that applicable to plaintiff's state

law claims. See *FS Photo, Inc. v. Picturevision, Inc.* 61 F. Supp. 2d 473, 479 (E.D. NY 1999).

169. This is because "a general merger clause such as the one contained in the Settlement Agreement cannot bar a federal securities claim because the Securities Act itself precludes agreements waiving compliance with the statute's anti-fraud provisions." *Id.* citing 15 U.S.C. § 78cc(a). The Nebraska Securities Act, likewise, has an anti-waiver clause. Neb. Rev. Stat. § 8-1118(4) states that "any condition, stipulation, or provision binding a person to waive compliance with any condition, or provision of the Act, or any rule or regulation thereunder, is void."

170. As to the non-securities state law claims, though not relevant to count 1, Defendants inevitable arguments about the application of the merger clause in the Confidential Settlement Agreement to defeat the state law claims fail for a different reason. This is because "a contractual disclaimer of reliance is not a prophylactic against a claim of fraud." Id. citing *Hitachi Credit American v. Signet Bank, 166 F. 3d 614, 639 (4th Cir. 1999).* "Put another way, in a claim for fraud, a party may point to representations outside of the contract to show that those representations induced the party to enter into the contract, even if the contract itself contains a clause limiting or disclaiming liability for such representations." *Id.*

**B. The Half-Truth Doctrine: Defendants' Selective Disclosures Were Themselves Fraudulent**

171. The Supreme Court has held that "[a] statement that is literally true" can nonetheless be "misleading" if it "omits material information." *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 190 (2016); see also *Omnicare, Inc. v. Laborers District Council Constructing Industry Pension Fund*, 575 U.S. 175, 189 (2015) ("[I]f a registration statement omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor

would take from the statement itself, then [the issuer] has made a material misstatement"). A half-truth—"a representation that states the truth only so far as it goes, but which is misleading because it omits to state other facts that are equally true"—is as actionable under Rule 10b-5 as an outright lie. *Restatement (Second) of Torts* § 529.

172. Defendants' fraud did not operate through silence alone. Rather, Defendants employed a calculated strategy of selective disclosure: they revealed enough about the Madison Transaction to create an appearance of transparency while systematically concealing the specific facts that would have revealed the magnitude of the fraud being perpetrated against Plaintiff. Each disclosure Defendants made—the September and October 2022 shareholder letters, the October 17, 2022 shareholder call, and the January 24, 2023 Information Statement—was a half-truth that, by what it omitted, was more misleading than silence would have been.

## C. The Fraudulent Scheme: Particularity Under the PSLRA

173. Pursuant to 15 U.S.C. § 78u-4(b)(1), Plaintiff alleges the following misrepresentations and omissions with particularity, specifying each statement alleged to have been misleading, the reasons each statement was misleading, and all facts on which Plaintiff's belief is formed. As required by *In re 2007 Novastar Financial, Inc., Securities Litigation*, 579 F.3d 878, 882 (8th Cir. 2009), Plaintiff provides a "side-by-side" comparison of each materially false or misleading statement against specific contradictory information in Defendants' actual possession at the time each statement was made. The scheme operated in six phases.

### *Phase 1: The Foundational Fraud—The June 14, 2022 Mediation Misrepresentation*

174. On June 14, 2022, Stacy Ryan asked about Streck's per share value in advance of attending a mediation regarding her existing claims against Streck,

Inc. before mediator Mark A. Christensen. Defendant Connie Ryan—acting through her attorney Victoria H. Buter of Kutak Rock LLP—presented a mediation statement approved by the Streck Board of Directors representing that "Streck's fiscal year now ends in June. Streck obtained a valuation from Stout valuing Streck's shares as of end of fiscal year 2021. The valuation valued Streck's shares at just under $27 per share." The statement further represented that "a purchase of Stacy Ryan's shares would total between $27 million and $30.3 million." The letter further stated that: "Streck does not have a valuation for fiscal year 2022 and will not have such valuation for several months." This false disclosure followed numerous demands for copies of the valuation, all of which were refused by Streck.

175. This representation was the cornerstone of a fraudulent scheme. It was communicated directly to Plaintiff as the basis for the purchase of Plaintiff's shares and obtaining a settlement of Plaintiff's valuable pending litigation against Streck, and Plaintiff relied upon it in executing the Mediation Settlement Memorandum ("MSM") on June 17, 2022, which locked Plaintiff into a framework of approximately $39.00 per share. The MSM was executed <u>before</u> Defendants made any disclosure to shareholders about Madison Transaction. By the time any shareholder letter was sent, Plaintiff was already bound and at every opportunity Streck and Connie Ryan would continue to lie that they could bind her to the $39.00 price per share if she did not agree to dismiss her valuable litigation and otherwise give into their demands. They never told her that they needed her to do so for the Madison Transaction to close.

176. From the time of the lies and omissions described above, to this very date, Defendant Streck and Connie Ryan are obligated to inform Plaintiff of the true value of her shares and her claims and the value of her right not to agree to dismiss the pending litigation. They have not. Having spoken on the specific subject of share value to Plaintiff, Defendants still now have an affirmative duty to correct that specific statement when they obtained

contradictory information. *See Backman v. Polaroid Corp.*, 910 F.2d 10, 16–17 (1st Cir. 1990) (en banc) (duty to update or correct prior statements that become materially misleading due to subsequent events).

177. The $27 representation was materially false and misleading when made on June 14 2022 in the mediation statement and again repeated at the mediation on June 17, 2022. At the time Defendant Connie Ryan authorized this representation, she knew:

178. (a) Thirteen days earlier, on June 1, 2022, Defendant Larry Gies had executed a Confidentiality Agreement with Streck, Inc. on behalf of Madison Industries, initiating formal due diligence for a potential acquisition of the company at a price that would ultimately exceed $1.3 billion (Gies Dep. at 9–28);

179. (b) Defendant Connie Ryan, as Chairperson of the Board and Chief Executive Officer of Streck, Inc., was personally directing the Madison acquisition process and was a party to the June 1, 2022 Confidentiality Agreement;

180. (c) Streck had in its possession the 2021 Stout valuation showing an enterprise value of $1,130,000,000 as of June 30, 2021—equating to approximately $60.00 per share—more than double the $27 figure represented to Plaintiff (as Streck later admitted in paragraph 19 of its complaint in the Appraisal Litigation, CI 23-886); and

181. (d) The June 30, 2022 Stout valuation, then being prepared, would show an enterprise value of $1,270,000,000—equating to approximately $67.60 per share—and financial data available to Defendant Connie Ryan confirmed the company's value far exceeded $27.00 per share.

***Phase 2: Selective Disclosure as Concealment—The September–October 2022 Shareholder Letters***

182. Between September 1 and October 6, 2022, Defendants caused Streck to send three shareholder letters to all shareholders and beneficiaries, including

Plaintiff: (1) a September 1, 2022 letter (Exhibit 65) attaching the first Madison Letter of Intent; (2) a September 26, 2022 letter (Exhibit 66) disclosing a revised LOI at $1.6 billion; and (3) an October 6, 2022 letter (Exhibit 78) describing the F reorganization structure.

183. Defendants will point to these letters as evidence that Plaintiff was informed about the Madison Transaction. But these letters were half-truths that made Defendants' fraud worse, not better, for three independent reasons:

184. (a) **The letters did not correct the $27 misrepresentation.** Defendants had made a specific, false representation to Plaintiff during mediation that her shares were worth "just under $27 per share." The September letters disclosed, to the universe of shareholders, that a $1.3–$1.6 billion transaction was pending. But no letter, no communication, no correction was ever directed to Plaintiff stating: "The $27 figure we communicated to you at mediation was false; the actual Stout valuations show your shares are worth approximately $60 per share; and the pending Madison Transaction values them at $59–$73 per share." Having spoken on the specific subject of share value to Plaintiff, Defendants had an affirmative duty to correct that specific statement when they obtained contradictory information. *See Backman v. Polaroid Corp.*, 910 F.2d 10, 16–17 (1st Cir. 1990) (en banc) (duty to update or correct prior statements that become materially misleading due to subsequent events). The $27 price was never truthful and has not been corrected.

185. (b) **The letters disclosed the transaction but concealed its implications for Plaintiff's settlement.** By September 2022, Plaintiff was already bound to the MSM at approximately $39.00 per share. The shareholder letters disclosed that Madison had offered $1.3–$1.6 billion for Streck but did not disclose to Plaintiff that this meant each share was worth approximately $59–$73—rendering the MSM price of $39 per share a fraction of the shares' true value. The letters were generic corporate disclosures to all shareholders; they were not directed at correcting the specific fraud perpetrated on Plaintiff. A reasonable shareholder reading these letters would not have understood that

she was being defrauded out of tens of millions of dollars through a settlement pegged to a false $27 valuation, because the letters never connected the transaction price to the per-share value of stock or to the mediation representation.

186. (c) **The letters omitted material facts that would have revealed the scope of the fraud.** Even taken on their own terms, the shareholder letters omitted material information including: (i) the actual Stout valuations ($1.13 billion as of June 30, 2021; $1.27 billion as of June 30, 2022), which Streck had in its possession and later admitted in the Appraisal Litigation; (ii) Defendant Connie Ryan's personal counter-proposal of $1.7 to $2.1 billion ($77–$95 per share), as Defendant Gies testified (Gies Dep. at 32:18–24); (iii) Defendant Gies's internal valuation analysis by David Janicek modeling purchase prices of $1.7–$2.1 billion (Exhibit 33, August 21, 2022); and (iv) Defendants simultaneously concealed that Madison's own internal valuation analysis—prepared by David Janicek at Gies's direction—modeled purchase prices in excess of what he ended up paying. See E-6 p. 077 – 078. Gies believed that Streck "should be valued at 9 to 13x" EBITDA—multiples that, applied to Streck's financials, upon information and belief, confirmed the company was worth substantially more than the $1.6 billion Madison was paying. See E-6 p. 077 – 078.

***Phase 3: The October 17, 2022 Affirmative Misrepresentation—Connie Ryan Denies Rollover***

187. On October 17, 2022, in a recorded telephone conference call with shareholders, Defendant Connie Ryan affirmatively represented that "Matt and I will be selling our shares" and answered "no" to a direct question asking whether she would be participating in an equity rollover as part of the Madison Transaction (Recorded Call Transcript, 7-minute mark).

188. This was a knowingly false statement. Defendant Connie Ryan was at that time actively negotiating a substantial rollover of her equity into the

Madison acquisition entity. She would ultimately roll approximately $40 million into Madison Streck Holdings II LLC on January 24, 2023, retaining significant equity in a $1.6 billion enterprise (Exhibits 26, 86). Her children, Defendants Matt Kreifels and Carrie Kreifels, would also roll over their interests. This affirmative misrepresentation, made directly to shareholders including Plaintiff, is independently actionable under Rule 10b-5.

189. The rollover denial was material because it concealed the fundamental conflict of interest at the heart of the Madison Transaction: Defendant Connie Ryan was not simply "selling her shares" like other shareholders; she was converting her controlling position into a permanent equity stake in the acquiring entity—a benefit unavailable to Plaintiff and other minority shareholders who were being pressured to cash out under the MSM framework.

***Phase 4: The January 24, 2023, Information Statement—Material Omissions Amid Apparent Disclosure***

190. On January 24, 2023, Defendants caused Streck to distribute a Notice of Special Shareholders Meeting, Information Statement, and related materials (Exhibit 67, with Appendices at Exhibit 68) to all shareholders and beneficiaries, including Plaintiff. The Information Statement is the most significant example of the half-truth doctrine at work in this case. It disclosed certain facts—the $70.10 per-share transaction price, that Connie Ryan had elected the "Reinvestment Option," and that BofA Securities had rendered a fairness opinion. But the Information Statement was materially misleading because of what it omitted and what it misrepresented:

191. (a) **All Stout valuations were concealed until their disclosure would be of no value to Plaintiff.** Stout had concluded that Streck shares were worth well above $39 per share in many prior valuations. Madison analyst Brian Richards testified that he saw the Stout appraisal before closing and discussed it with attorney Dale Dixon of Kutak Rock. This independent

valuation—$61.98 per share—confirmed that even the $70.10 transaction price was only marginally above independent fair value, and that the $39.00 MSM price to which Plaintiff was being held represented a discount of 37% below independently appraised value. The significance of this, however, is the timing. Relevant Stout valuations disclosed until provided with the January 24, 2024 Information Statement. The timing is important, because by then Plaintiff was not able to use that information to decide whether to sign the MSM. That was the very point of the delay. Connie confirmed this to the Board explaining that the June 17 MSM's purpose was to dispose of the "lawsuits that Stacy has filed about the bylaws and the shares gifted through her parents GRAT." *See E-7 012.*

**From:** Constance Ryan [CRyan@Streck.com]
**Sent:** 6/20/2022 5:25:05 PM
**To:** Bill Fairfield [bill@gmswerks.com]; Bill Gerber (William.Gerber@btn-inc.com) [William.Gerber@btn-inc.com]; Gary Gates (gpg440@gmail.com) [gpg440@gmail.com]; Lisa Roskens [lroskens@burlingtoncapital.com]; Sue Thaden [sthaden@clientresourcesinc.com]; Constance Ryan [CRyan@Streck.com]; Jack Becker [jbecker@joslyn.org]; Mike Cassling [mcassling@cquencehealth.com]
**Subject:** Fw: Scorecard and Sales Analysis for the Board - May FY2022
**Attachments:** Scorecard and Sales Analysis - FY22 May.pdf

In May we were under forecast by $660,000. This was due to BCT being under forecast. YTD sales are $199.34M, $5.4M over forecast.
The products primarily contributing to over forecast are BCT, hematology, flow cytometry, and Sickle Cell test.
Sales continue to be strong. We are considering a financial partnership with Ceres who makes the hydrogels we have incorporated into a product to be released this summer.
June will be our final month for F'22 and Sales have been strong.
In the past couple of months we have lost three executives HR Director, IT Director, and Marketing Director. We are close to hiring a new HR Director. My goal is to hire talent and skill. Our Marketing Director is a long saga and we are working with Kutak to resolve.
These steps are to prepare us for growth and a plan for the future. I will be going to Madison Industries CEO Day. It is one of the largest private companies in the US. Using the Berkshire model, but staying private, he only buys companies that make a difference in our lives. So he has a medical division. The CEO is Larry Gies. Please look at the web site. I have known Larry for years and he recently called an invited me to the CEO Day. I think there is a possibility this could be the best place for Streck.
I look forward to discussing my time there and your thoughts at our next board meeting.
We have been getting great publicity on the apartments and we are ahead of schedule! Hopefully will open early 2023!
Lastly we have reached an agreement to purchase Stacy Ryan and her three sons shares. This will also settle the lawsuits Stacy has flied about the bylaws and her shares gifted through her parents GRAT. The case against Steve Ryan will remain open and my personal attorney, Damien, will file that she was given a settlement from the estate and that a settlement to one, means a settlement for all. Hopefully I will receive and possibly the Supreme Court understands what my brother has done to gain control of my father and his estate and more changs will result.
Any questions, let me know.
Connie

The withholding of information to Plaintiff, combined with the lie about the value of Streck's shares ($27) was the whole point of the MSM and "Larry's ask" that all litigation be resolved. The subsequent threats to hold Plaintiff and her sons to a $39 price if she did not agree to dismiss her lawsuits extended

that lie (and the omissions) to allow the Madison Transaction to close (it was a contractual closing condition that there be no such outstanding litigation). The January 24 half-truth disclosures by Streck were useless to Plaintiff because she was deprived of the information disclosed until she could not use it.

192. (b) **The Information Statement concealed and misrepresented the Bio-Rad competing offer.** On December 9, 2022, Bio-Rad Laboratories, Inc.—a New York Stock Exchange-listed corporation and existing Streck customer—submitted a letter of intent to acquire Streck at a price of approximately $2.0 billion, representing approximately $111.11 per share, a 25% premium over the Madison price. The Information Statement's only reference to this $2.0 billion offer was a buried, anonymous passage on page 15 referring to "an unsolicited, conditional, non-binding proposal from a competitor" and claiming that the "Special Committee, after consulting with its financial and legal advisors, including outside counsel regarding the antitrust implications of the proposal, determined that the transaction with the competitor would likely be significantly delayed by antitrust review by federal regulators." More importantly, however, this information was only disclosed after the information was no longer useful to her, because Streck, Inc. and Connie Ryan could, by then, threaten to hold Plaintiff to $39 per share unless she continued to agree to dismiss the litigation she was involved in.

193. The antitrust rationale was a pretext. Director Gary Gates testified under oath that there was "no agenda item" for antitrust analysis of the Bio-Rad offer and that the Board never asked Madison to match Bio-Rad's price. (BOE Vol. VII, Ex. 95, Gates Dep. at 93–98.) No genuine antitrust analysis was ever performed by the Special Committee, the Board, or any retained advisor. The "antitrust" justification disclosed in the Information Statement was itself a misrepresentation—an irrelevant rationale designed to conceal the true reason the Bio-Rad offer was rejected: Defendants Connie Ryan and Gies were determined to protect "our deal" at all costs.

194. Defendant Connie Ryan personally blocked negotiations with Bio-Rad. Gies testified: "My understanding was that Bio-Rad was told that they could not negotiate with them, that Streck, the company, could not negotiate with Bio-Rad." "Who told you that?" "Connie." (Gies Dep. at 58.) This was false: the Madison LOI exclusivity period was expiring on January 1, 2023, and Streck was free to engage with Bio-Rad. Defendant Connie Ryan's decision to shut down a $2.0 billion offer—$400 million more than the Madison price—without meaningful investigation was not a good-faith business judgment; it was an act of self-dealing to preserve her $40 million rollover and continuing equity position in the Madison entity, which would have been jeopardized by a competing transaction. The Information Statement disclosed none of this: not the identity of the offeror, not the price offered, not that Connie Ryan personally blocked negotiations, and not that the stated antitrust rationale was fabricated and/or wholly irrelevant as to whether the Madison Transaction was fair or not.

195. (c) **The Information Statement falsely represented that all shareholders had the "Reinvestment Option."** Page 19 of the Information Statement stated: "As set forth above in 'Description of the Transactions—Reinvestment Option' each shareholder of Streck has the opportunity to exercise the Reinvestment Option." This was false as applied to Plaintiff and her sons. Defendants had already bound Plaintiff to the MSM framework and intended to compel execution of a Confidential Settlement Agreement that would permanently preclude Plaintiff from any future ownership of Streck or participation in the rollover. The representation that "each shareholder" had the Reinvestment Option was a material misrepresentation: Plaintiff did not have that option, because Streck and Connie Ryan had ensured she would not through the fraudulent $27 valuation in the MSM.

196. (d) **The Information Statement concealed the magnitude and timing of Connie Ryan's rollover.** While the Information Statement disclosed that Connie Ryan and her children had elected the Reinvestment

Option, it understated the significance by not disclosing that Connie Ryan's rollover of approximately $40 million would give her an equity interest in a $1.6 billion enterprise through the Madison Streck Holdings II LLC Second Amended and Restated Limited Liability Company Agreement (Exhibit 86) while she was actively requiring that Stacy Ryan and her sons not have such rollover right.

197. (e) **The Information Statement concealed the terms of Gies's Class A share purchase.** While a January 5, 2023 letter (Exhibit 130) had disclosed that Gies purchased Connie Ryan's Class A voting shares, neither that letter nor the Information Statement disclosed the full implications: Gies purchased 196,850 Class A voting shares, obtaining 56.4% voting control of Streck so that Connie and the Directors would be assured the sale of Streck would occur no matter what. This is because if the director did not vote in favor of the deal, all Gies would have to do to approve the deal would be to replace the directors in a special meeting. He did not have to do that, however, because the compliant directors voted in favor of Larry Gies's and Connie's deal to sell Streck to themselves rather than considering or even looking at a $400,000,000 higher offer from Bio-Rad.

198. (f) **The Information Statement concealed that Plaintiff's litigation resolution was a closing condition.** The Securities Purchase Agreement executed February 10, 2023 (Exhibit 84), Section 5.6, required as a condition of closing that there be no "Proceedings" pending or threatened against Streck. Plaintiff's Share Value Litigation and Bylaw Litigation were such Proceedings. The Information Statement did not disclose that unless the condition was waived by Buyer (highly unlikely because third party investment bankers were investing into the deal) the entire $1.6 billion Madison Transaction depended on Plaintiff's agreement to dismiss her claims—information that would have revealed to Plaintiff that she had extraordinary leverage to demand far better terms than the MSM framework offered.

199. (g) **The Information Statement disclosed the BofA fairness opinion but concealed that the insider buyer's own internal valuation methodology.** The Information Statement presented the BofA Securities fairness opinion as independent validation of the $1.6 billion transaction price. But Defendants simultaneously concealed that Madison's own internal valuation analysis—prepared by David Janicek at Gies's direction—modeled purchase prices in excess of what he ended up paying. See E-6 065 -67; E-6 p. 077 – 078. This is the most damning category of half-truth: Defendants affirmatively presented a fairness opinion's conclusions to make shareholders comfortable with the transaction price while concealing that the buyer's own controlled affiliate had generated its own calculations. A reasonable shareholder who knew that an insider's firm (Madison Industries, controlled by Larry Gies) had developed pricing and value models the shareholder had not seen—and who had never been given the valuations Streck itself had, not would never have signed the MSM or even the subsequent CSA surrendering her shares and claims at a price the buyer itself presumably regarded as a bargain. Defendants, including the Director Defendants, had a duty to disclose Madison's internal valuations and assumptions because the transaction was between related parties and their interests were conflicted, yet they made no effort to do so.

***Phase 5: The Director Defendants' Independent Role in the Fraudulent Scheme***

200. The director Defendants were not mere passive observers of the fraud described above. They were active participants who, at each critical juncture, exercised their authority to facilitate a transaction that they knew was being consummated through the concealment of material information from shareholders—including Plaintiff—and through the self-dealing of Defendants Connie Ryan, her children Matt Kreifels and Carrie Kreifels (who also rolled over equity) and Gies.

201. At no useful time did the Director Defendants or Connie Ryan (also a director) allow Streck to provide with with copies of any Stout valuation report or the BofA Securities fairness opinion. The Stout valuations were prepared annually at Streck's expense and showed enterprise values of $824 million (June 30, 2019), $940 million (June 30, 2020), $1.13 billion (June 30, 2021), and $1.27 billion (June 30, 2022)—as Streck itself later admitted in its Appraisal Litigation complaint. These were the company's own independent valuations, and to this date no Defendant has corrected the materially false $27 per share figure that was communicated to Plaintiff in the June 14, 2022 mediation statement—a statement that the Board itself had approved. Stacy could not have discovered this information.

202. The Director Defendants approved the sale of voting control to Defendant Gies with full knowledge of its purpose and consequences. On December 21, 2022, the Board held a special meeting to consider whether Streck should exercise its right of first refusal on Connie Ryan's proposed sale of 196,850 Class A voting shares to Gies. The Board chose not to exercise the right of first refusal, finding it "not in the best interests of [Streck]" to do so. The Director Defendants knew that this sale would give Gies—the CEO of the acquiring entity—majority voting control of the company he was buying, enabling him to vote to approve his own transaction. They knew this was the mechanism by which "our deal" would be consummated without the consent of the Class B nonvoting shareholders and with considering a third party arm-length LOI offering an additional $400,000,000 in shareholder value. They approved it anyway and buried all relevant details about the Bio-Rad offer.

203. The Director Defendants never gave meaningful consideration to not selling Streck at all. Streck was a highly profitable, growing enterprise with a dominant market position in medical diagnostics. There was no financial distress, no liquidity crisis, and no business necessity compelling a sale. The rationale for selling was that the Board and Defendant Connie Ryan were "tired" of family litigation—a rationale that was not a legitimate business

justification for transferring a billion-dollar enterprise to two insiders at a price $400 million below a competing offer. E-3 153. The costs of family litigation were a rounding error relative to the value the Board gave away.

204. The Director Defendants never actually considered the Bio-Rad offer. Director Gates testified that there was "no agenda item" for antitrust analysis of the Bio-Rad offer and that the Board never asked Madison to match Bio-Rad's $2.0 billion price. E-7 087 The Board's dismissal of a $400 million premium—representing approximately $22 per share in additional value for every shareholder—without any genuine analysis was not a good-faith exercise of business judgment. The antitrust rationale was fabricated and even if was not it was irrelevant: no antitrust study was commissioned, no antitrust counsel was retained to analyze the Bio-Rad proposal, and the LOI exclusivity period with Madison was expiring on January 1, 2023. The Director Defendants simply accepted Defendant Connie Ryan's determination to reject the offer because it threatened "our deal."

205. Instead of protecting minority shareholders, the Director Defendants sold Streck to two insiders—Defendant Connie Ryan (who retained substantial equity through rollover) and Defendant Gies (who acquired the company at his own chosen price through an entity he controlled)—at a price $400,000,000 below what an independent, arm's-length buyer (Bio-Rad) was willing to pay. The Directors facilitated this result by: (a) approving the transfer of voting control to the buyer; (b) recommending a transaction without disclosing the Stout valuations or any internal valuation to shareholders; (c) fabricating an antitrust rationale to dismiss a $2.0 billion competing offer; (d) approving the restructuring of the transaction as an asset sale specifically to eliminate the need for Class B shareholder approval; and (e) authorizing the Information Statement that contained the half-truths and omissions described above. Each of these acts constituted knowing participation in the fraudulent scheme, and each is independently actionable under Rule 10b-5(a) and (c) as participation in a scheme to defraud.

***Phase 6: The Coerced Execution of the Confidential Settlement Agreement***

206. Between November 2022 and February 2023, Defendants, through Streck's counsel, sent a series of communications to Plaintiff threatening to hold her to the MSM's $39 per share price if she did not execute the Confidential Settlement Agreement ("CSA"). These threats were made while Defendants possessed all of the information described above and while Defendants knew that the MSM itself had been procured through the fraudulent $27 representation.

207. On or about February 4, 2023, Plaintiff executed the CSA, and the transaction closed on or about February 20–21, 2023, requiring the transfer of Stacy and her sons shares for cash consideration. The "choice" presented to Plaintiff was: sign the CSA at $70.10 per share, or be held to the MSM at approximately $39 per share—a framework that was itself the product of fraud and a failure to correct a false claim that Streck's stock was valued at $27 per share by Stout for the 2021 fiscal year. The CSA further required Plaintiff and her sons to dismiss the Bylaw Litigation and Share Value Litigation, release all claims, and agree never to acquire any Streck shares in the future—permanently extinguishing Plaintiff's rights and claims for the benefit of Defendants' $1.6 billion transaction. The scheme transferred value from Plaintiff shares in Streck, to Defendants in violation of the disclosure and fiduciary obligations of the Defendants.

**D. "Novastar" Side-by-Side Comparison: What Defendants Disclosed vs. What They Concealed**

208. Pursuant to *In re 2007 Novastar Financial, Inc., Securities Litigation*, 579 F.3d 878, 882 (8th Cir. 2009), Plaintiff presents the following side-by-side comparison. Critically, the right-hand column does not merely identify "contradictory information in Defendants' possession"—it identifies information that Defendants had an affirmative duty to disclose but

deliberately withheld while making selective disclosures designed to appear transparent.

| Date | What Defendants Disclosed or Represented | What Defendants Simultaneously Concealed |
|---|---|---|
| **June 14, 2022** | **What Defendants Said:** Board-approved mediation statement: "The valuation valued Streck's shares at just under $27 per share." "A purchase of Stacy Ryan's shares would total between $27 million and $30.3 million." | **What Defendants Concealed:** (1) The 2021 Stout enterprise valuation of $1.13B ($60/share); (2) the June 1, 2022 Confidentiality Agreement with Madison Industries initiating billion-dollar acquisition; (3) Connie Ryan's personal direction of the Madison process; (4) financial data demonstrating value far exceeding $27/share. No disclosure of any usefulness was made to Plaintiff before the MSM was signed on June 17, 2022. |
| **Sept. 1–26, 2022** | **What Defendants Disclosed:** Shareholder letters (Exs. 65, 66) disclosed Madison's interest, attached LOI at $1.3B (later $1.6B), described potential transaction. These were generic letters to all shareholders. No letter was directed to Plaintiff correcting the $27 representation. | **What Defendants Concealed:** (1) Per-share implications: $1.3–$1.6B = $59–$73/share, making Plaintiff's MSM price of $39 a 33–47% discount; (2) actual Stout valuations ($1.13B, $1.27B); (3) Defendants simultaneously concealed that Madison's own internal valuation analysis— |

| Date | What Defendants Disclosed or Represented | What Defendants Simultaneously Concealed |
|---|---|---|
| | | prepared by David Janicek at Gies's direction—modeled purchase prices in excess of what he ended up paying. See E-6 p. 077 – 078. Gies believed that Streck "should be valued at 9 to 13x" EBITDA—multiples that, applied to Streck's financials, upon information and belief, confirmed the company was worth substantially more than the $1.6 billion Madison was paying. See E-6 p. 077 – 078. Most critically: no correction to Plaintiff that $27 was false. |
| **Oct. 17, 2022** | **What Defendants Said:** On recorded shareholder call, Connie Ryan stated "Matt and I will be selling our shares" and answered "no" to direct question about equity rollover. Also stated "all the litigation get be resolved" as "part of Larry's ask." | **What Defendants Concealed:** (1) The "no rollover" statement was knowingly false—Connie Ryan was actively negotiating a $40M rollover equity in the Madison Transaction); (2) that Plaintiff's litigation resolution was a "condition of closing"—meaning Plaintiff had leverage Defendants were concealing from her; (3) the true reason "all litigation" needed |

| Date | What Defendants Disclosed or Represented | What Defendants Simultaneously Concealed |
|---|---|---|
| | | resolution: SPA § 5.6 made it a closing condition. |
| **Dec. 2022–Jan. 2023** | **What Defendants Disclosed:** Jan. 5, 2023 letter (Ex. 130) disclosed Gies's purchase of Connie Ryan's Class A shares. LOI extension executed Dec. 15, 2022. Information Statement p. 15 referred to anonymous "competitor" proposal, claiming "Special Committee" determined it would be "significantly delayed by antitrust review." | **What Defendants Concealed:** (1) Bio-Rad LOI at $2.0B ($111.11/share, 25% premium)—identity and price hidden; (2) Connie Ryan personally told Bio-Rad "they could not negotiate" (Gies Dep. 58)—false, as LOI exclusivity expired Jan. 1; (3) antitrust rationale was fabricated and irrelevent—Director Gates testified there was "no agenda item" for antitrust analysis and the Board never asked Madison to match the price (Gates Dep. 93–98); (4) true motive: protecting "our deal"—Connie Ryan's $40M rollover and Gies's acquisition at $400M below competing offer; (5) Stout Dec. 31, 2022 valuation at $61.98/share (Ex. 40); (6) Gies purchased majority ownership to "lock in" transaction value); (7) Defendants simultaneously concealed that Madison's own |

| Date | What Defendants Disclosed or Represented | What Defendants Simultaneously Concealed |
| --- | --- | --- |
| | | internal valuation analysis—prepared by David Janicek at Gies's direction—modeled purchase prices in excess of what he ended up paying. See E-6 p. 077 – 078. Gies believed that Streck "should be valued at 9 to 13x" EBITDA—multiples that, applied to Streck's financials, upon information and belief, confirmed the company was worth substantially more than the $1.6 billion Madison was paying. See E-6 p. 077 – 078; (8) All assumptions used in the BofA fairness opinion and that BofA did not know of Bio-Rad offer; circumstances and JPMorgan's refusal to opine. |
| **Jan. 24, 2023** | **What Defendants Disclosed:** Information Statement (Ex. 67) disclosed $70.10/share price, Connie Ryan's reinvestment election, BofA fairness opinion summary only, and stated "each shareholder of Streck has the opportunity to exercise the | **What Defendants Concealed:** (1) Stout $61.98 valuation (Ex. 40); (2) Bio-Rad identity and $111.11/share price—Connie Ryan personally blocked negotiations, Gates confirmed no antitrust analysis performed; (3) Defendants simultaneously concealed that |

| Date | What Defendants Disclosed or Represented | What Defendants Simultaneously Concealed |
|---|---|---|
| | Reinvestment Option." Connie Ryan signed rollover Contribution Agreement this same date (Ex. 26). Buried reference to anonymous "competitor" with fabricated and/or irrelevant to fairness of the Madison Transaction "antitrust" rationale. | Madison's own internal valuation analysis—prepared by David Janicek at Gies's direction—modeled purchase prices in excess of what he ended up paying. See E-6 p. 077 – 078. Gies believed that Streck "should be valued at 9 to 13x" EBITDA—multiples that, applied to Streck's financials, upon information and belief, confirmed the company was worth substantially more than the $1.6 billion Madison was paying. See E-6 p. 077 – 078.; (4) that the "Reinvestment Option" was unavailable to Plaintiff under the MSM/CSA framework; (5) rollover magnitude: (Ex. 86); (6) SPA § 5.6 making Plaintiff's litigation a closing condition; (7) Gies admission he could "make more buying at $1.6B than selling at $2B"; (8) rollover signed same date, 11 days before Plaintiff induced to sign CSA. |

| Date | What Defendants Disclosed or Represented | What Defendants Simultaneously Concealed |
|---|---|---|
| **Feb. 4–21, 2023** | **What Defendants Disclosed:** Defendants presented Plaintiff with the CSA: sign at $70.10/share or be held to MSM at $39/share. Required dismissal of all litigation, release of all claims, permanent ban on acquiring Streck shares. | **What Defendants Concealed:** All of the foregoing, plus: (1) that the MSM itself was the product of fraud (the $27 foundation); (2) that Plaintiff's agreement to dismiss litigation was worth tens of millions because SPA § 5.6 made it a condition of the $1.6B closing; (3) Connie Ryan's rollover signed 11 days earlier; (4) $27 was false by factor of 2.3x–4.1x ($61.98–$111.11); (5) Madison's own internal Janicek models existence; (6) antitrust rationale for rejecting Bio-Rad was fabricated and irrelevant to the pertinent question of the fairness of the Madison Transaction (Gates: "no agenda item"); (7) Plaintiff was being permanently excluded from a transaction that other shareholders could participate in. |

<u>**E. Scienter: "Strong Inference" of Fraudulent Intent Under the PSLRA**</u>

209. Pursuant to 15 U.S.C. § 78u-4(b)(2) and *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007), the inference of scienter must be "cogent

and at least as compelling as any opposing inference one could draw from the facts alleged." The facts here do not merely support an inference of scienter—they compel it. No innocent explanation accounts for Defendants' conduct. The very pattern of selective disclosure—revealing enough to create an appearance of transparency while concealing the facts that would have exposed the fraud—is itself evidence of scienter.

### *1. Actual Intent to Deceive*

210. Defendant Connie Ryan's conduct demonstrates actual intent to deceive at every stage:

211. (a) She knowingly approved the objectively false $27 value per share statement in the mediation statement delivered on June 14, 2022 and repeated it to Stacy through the mediator on June 17, 2022, while having previously negotiated with Larry Gies a sale at prices exceeding $60+ per share and while possessing Stout valuations showing the $27 figure was false by a factor of more than 2x;

212. (b) She then personally negotiated the $1.6 billion acquisition price with Defendant Gies during two telephone calls in September 2022, counter-proposing $1.7 to $2.1 billion (Gies Dep. at 32:18–24, 39:14–41:24), while the $27 representation to Plaintiff remained uncorrected.

213. (c) She affirmatively lied to shareholders on October 17, 2022, stating she would not participate in a rollover, while actively negotiating a $40 million rollover that would give her significant equity in a $1.6 billion enterprise;

214. (d) She sold 196,850 Class A voting shares to Defendant Gies to lock in the Streck Sale—as Gies testified—she told him "the only way that a deal could get consummated was if she took herself out of the ownership of those shares" (Gies Dep. at 44:22–24) and it also assured Gies that if he did not get the vote the first time, he could replace the board members with ones that would approve the transaction;

215. (e) She signed the rollover Contribution Agreement on January 24, 2023—the same date as the Information Statement and eleven days before inducing Plaintiff to sign the CSA—ensuring that her permanent equity position was locked in before Plaintiff's litigation claims were extinguished and that Larry Gies would be able to force the closing of "our deal" with the voting shares he acquired from her; and

216. (f) She knew the Stout $61.98 valuation, the Bio-Rad $2.0 billion offer—none of which were disclosed to Plaintiff in connection with the $27 representation or the CSA execution.

***2. Severe Recklessness***

217. Even if Defendants' conduct is not found to constitute actual intent, the facts alleged give rise to a strong inference of severe recklessness. *K-Tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 896 (8th Cir. 2002) (defining severe recklessness as "an extreme departure from the standards of ordinary care" presenting "a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it").

218. The gap between the $27 represented value and the known value range ($59–$111) was not a matter of reasonable disagreement. The danger of misleading Plaintiff was not merely "so obvious" that Defendants "must have been aware of it"—Defendants were actually aware of it, as evidenced by their subsequent decision to conceal the Stout valuations until such time they were of no value to Plaintiff.

219. Defendant Gies was independently reckless. As CEO of Madison Industries and, following his January 2023 Class A share purchase, as the controlling voting shareholder of Streck, Gies: (a) possessed and directed the preparation of internal valuation models confirming Streck's value vastly exceeded $27 and/or $39 per share; (b) knew of the Bio-Rad $2.0 billion offer and took no meaningful steps to investigate it (Gies Dep. at 54:22–67:21); (c) knew that resolution of Plaintiff's litigation was a closing condition under SPA

§ 5.6; and (d) acknowledged under oath that he owed a fiduciary duty to nonvoting shareholders (Gies Dep. at 67:22–69:13), yet took no steps to correct the $27 misrepresentation or ensure Plaintiff received accurate information and/or that the Madison Transaction was fair.

### *3. Motive and Opportunity*

220. Defendants had powerful, concrete financial motives to maintain the fraud:

221. (a) Defendants Matthew Kreifels, Carrie Kreifels, and Connie Ryan's rollover of equity into the Madison Transaction. This rollover was vastly more valuable if Plaintiff's shares were extracted cheaply: every dollar saved on Plaintiff's settlement accrued directly to Connie Ryan's equity position.

222. (b) Defendant Gies testified that he could "make more buying at $1.6 billion than selling at $2 billion" (Gies Dep. at 83), confirming that suppressing the price—including by ensuring Plaintiff's claims did not interfere with closing—directly benefited Madison.

223. (c) Under SPA § 5.6, Plaintiff's litigation resolution was a condition of closing. If Plaintiff had known: (i) that the $27 representation was false; (ii) that her litigation was worth tens of millions as a blocking condition; and (iii) that a $2 billion competing offer existed, she would never have executed the MSM or the CSA on the terms offered. The entire $1.6 billion transaction depended on keeping Plaintiff uninformed about her true leverage.

224. (d) Defendant Gies's purchase of 196,850 Class A shares at approximately to "lock in" the Madison Transaction latterly gave him the right to vote in favor of the Madison Transaction even if the board did not approve (he, as controlling voting shareholder could just have appointed himself as the sole director or replaced the board with directors who would do his bidding).

## <u>**F. Loss Causation**</u>

225. Under *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005), a plaintiff must demonstrate that the defendant's misrepresentation or omission was a "substantial cause" of the plaintiff's economic loss. Plaintiff's losses were directly and proximately caused by Defendants' fraud through the following causal chain:

226. (a) **The foundational fraud induced the MSM.** The false $27 representation on June 14, 2022 induced Plaintiff to execute the MSM on June 17, 2022, locking her into a $39 per share framework. This occurred before any shareholder disclosure. The MSM was the predicate for all subsequent harm.

227. (b) **The half-truths prevented Plaintiff from discovering the fraud.** The September–October 2022 shareholder letters and the January 2023 Information Statement disclosed enough about the Madison Transaction to appear transparent, but concealed the specific facts—the Stout valuations, the per-share implications for Plaintiff's settlement, the Bio-Rad offer, and the rollover magnitude—that would have revealed the fraud. A half-truth is more dangerous than silence precisely because it lulls the victim into believing she has been informed.

228. (c) **The MSM was used to coerce the CSA.** Defendants used the fraudulently obtained MSM as leverage: sign the CSA at $70.10 per share, or be held to the MSM at $39 per share. This "choice" was illusory because the MSM itself was the product of fraud.

229. (d) **Surrendered litigation claims.** The CSA required Plaintiff to dismiss the Bylaw Litigation and Share Value Litigation—claims that had substantial independent value and that constituted a closing condition under SPA § 5.6. Had Plaintiff known her true leverage, she could have refused to dismiss and either blocked the $1.6 billion transaction or demanded compensation reflecting the full value of her shares and claims.

230. (e) **Forfeited rollover opportunity.** Defendant Connie Ryan and her children (Defendants Matthew Kreifels and Carrie Krifels) rolled a substantial equity stake into the Madison Statement. The Information Statement

represented that "each shareholder" had the Reinvestment Option. But Plaintiff was contractually excluded because she was bound to the MSM/CSA. Had she known the truth, she could have demanded equal rollover participation.

231. (f) **Lost Bio-Rad premium.** Bio-Rad offered approximately $2.0 billion ($111.11/share), a 25% premium. Defendants rejected this offer without adequate investigation and concealed it from Plaintiff. Had Plaintiff known, she would have opposed the Madison Transaction.

232. (g) **Aggregate damages.** Plaintiff's aggregate damages—including the value of surrendered litigation claims, the lost rollover opportunity, and the Bio-Rad premium—exceed hundreds of millions of dollars. The precise amount will be established through expert testimony at trial.

## G. Reliance

233. Reliance is presumed under the *Affiliated Ute* doctrine, and independently established through Plaintiff's justifiable reliance on Defendants' affirmative misrepresentations.

### *1. The Affiliated Ute Presumption of Reliance*

234. In *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972), the Supreme Court held that where a claim involves primarily a failure to disclose, "positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision." The *Affiliated Ute* presumption applies to claims involving omissions or half-truths—that is, claims in which the defendant made representations that were misleading by reason of what they left out. See *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 159 (2008); *Joseph v. Wiles*, 223 F.3d 1155, 1162 (10th Cir. 2000) (applying

*Affiliated Ute* presumption where "the case involves primarily a failure to disclose").

235. This case is built on the half-truth doctrine. As alleged in detail above, every disclosure Defendants made was misleading because of what it omitted. The shareholder letters disclosed the Madison Transaction but concealed the per-share implications, the Stout valuations, the Connie Ryan counter-proposal, and the buyer's own internal models. The October 17 call disclosed the deal structure but omitted the rollover and affirmatively denied it. The Information Statement disclosed the BofA fairness opinion but concealed the buyer's own valuation, the Bio-Rad identity and price, the Reinvestment Option's unavailability to Plaintiff, and the closing condition under SPA § 5.6. The June 14, 2022 mediation statement represented $27 per share but concealed the Stout valuations, the Madison confidentiality agreement, and that a billion-dollar acquisition was underway. Each of these representations was an omission wrapped in a disclosure. The *Affiliated Ute* presumption applies to each, and Plaintiff is entitled to the presumption as to the entire fraudulent scheme.

236. The *Affiliated Ute* presumption is particularly appropriate here because Defendants were fiduciaries and corporate insiders with exclusive access to the withheld information, and Streck was a closely held corporation with no public financial reporting. Plaintiff had no independent source of valuation or transactional data. She was entirely dependent on what Defendants chose to disclose. The relationship between the parties is precisely the type of relationship in which the *Affiliated Ute* presumption is designed to operate: a case in which "the obligation to disclose and the withholding of a material fact establish the requisite element of causation in fact." 406 U.S. at 153–54.

### *2. In the Alternative, Plaintiff's Reliance Was Justifiable*

237. To the extent any aspect of this claim is construed as resting on affirmative misrepresentation rather than omission, Plaintiff's reliance was

justifiable. The standard is justifiable reliance, not reasonable reliance—a distinction the Eighth Circuit has recognized. See *Straub v. Vaisman & Co.*, 540 F.2d 591, 597 (3d Cir. 1976) (reliance need not be "reasonable in the sense that a person of ordinary prudence would have relied"; rather, it must be "justifiable in the sense that the plaintiff has a right to rely on the representation"); Restatement (Second) of Torts § 537 (1977) (a recipient of a fraudulent misrepresentation is justified in relying on it even if "its truth might have been ascertained had he made an investigation").

238. Plaintiff's reliance was justifiable at two levels:

239. (a) **The $27 representation.** Plaintiff justifiably relied on the June 14, 2022 Board-approved mediation statement that Streck stock was worth "just under $27 per share." This representation was made by the Chairperson and CEO of Streck, and through litigation counsel, in the context of a formal mediation, in a statement approved by the full Board. Defendant Connie Ryan was a corporate fiduciary with exclusive access to valuation information. Streck was a closely held corporation that did not publicly disclose financial data. Plaintiff had no independent means of determining share value; she had affirmatively sought valuation information and been refused at every step. Under these circumstances, a shareholder is entitled to rely on the fiduciary's representation of value without conducting an independent investigation. A fiduciary who lies about value cannot then claim the beneficiary should not have believed her.

240. (b) **The completeness of Defendants' subsequent disclosures.** Plaintiff justifiably relied on the apparent completeness of the shareholder letters, the October 17 shareholder call, and the Information Statement. When corporate insiders choose to speak about a material transaction, they assume a duty to speak fully and accurately. See *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1098 (1991). Plaintiff justifiably understood these disclosures to contain all material information. She did not know—and had no means to know—that the $27 figure was false, that the Stout valuations

showed $60+ per share, that Bio-Rad had offered $2 billion, that Connie Ryan had lied about the rollover, that the buyer's own analyst had concluded the price was a $100–$500 million discount, or that SPA § 5.6 made her litigation a closing condition giving her extraordinary leverage. These facts were locked inside documents that Defendants refused to produce and that were redacted or sealed in the only proceeding where they partially surfaced.

241. Defendants cannot argue that Plaintiff should not have relied on the $27 figure because the later shareholder letters disclosed a $1.3–$1.6 billion transaction. This argument conflates inquiry with discovery. Even a shareholder who questioned the $27 figure in light of the shareholder letters would have had no way to discover the facts establishing fraud: the Stout valuations were concealed, the Bio-Rad offer was buried and anonymized, the rollover was denied on a recorded call, and the antitrust rationale was fabricated, and even if it was not it was completely irrelevant to the pertinent question about whether the Madison Transaction was fair. Plaintiff affirmatively sought answers and was refused. A defendant who induces reliance through fraud and then obstructs the victim's attempts to discover the truth cannot be heard to complain that the victim's reliance was unjustified.

**H. In Connection With the Purchase or Sale of a Security**

242. The Confidential Settlement Agreement, executed on or about February 4, 2023, and closed on or about February 20–21, 2023, required the actual of more than 1,000,000 shares of Streck from Plaintiff to Streck (or its successor entity) for cash consideration. This was a purchase and sale of securities within the meaning of Section 10(b) and Rule 10b-5. See *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975).

243. The CSA was not an isolated litigation settlement. It was an integral component of the $1.6 billion Madison Transaction. Under SPA § 5.6, resolution of Plaintiff's litigation was an express closing condition. E-8 108 The CSA was a forced sale in which Plaintiff's equity interest was involuntarily

transformed from ownership in a billion-dollar enterprise into a cash claim at a price determined by fraud. The "forced seller" doctrine applies where, as here, a shareholder's interest is "extinguished by forces beyond the shareholder's control."

**I. Timeliness: The Statute of Limitations Does Not Bar This Action**

244. Section 10(b) claims are governed by the limitations period set forth in 28 U.S.C. § 1658(b), which requires that an action be brought (1) not later than two years after the discovery of the facts constituting the violation, or (2) not later than five years after such violation. *Merck & Co. v. Reynolds*, 559 U.S. 633, 637 (2010). The two-year period is a "discovery" statute of limitations; the five-year period is a statute of repose. Both are satisfied here.

245. As an initial matter, however, the reader should understand that the tolling analysis below is wholly unnecessary because the failure to correct the $27 false statement is a continuing obligation of Defendants Streck, Stacy Ryan and the director defendants. Having spoken on the specific subject of share value to Plaintiff, Defendants have a continuing affirmative duty to correct that specific statement after they obtained contradictory information which duty continues through the date of this complaint, because they have not corrected the fraudulent statement. *See Backman v. Polaroid Corp.*, 910 F.2d 10, 16–17 (1st Cir. 1990) (en banc) (duty to update or correct prior statements that become materially misleading due to subsequent events). The $27 price was never truthful and has never been corrected.

246. As controlling shareholder, President, CEO, and Director of Streck, Defendant Connie Ryan owed fiduciary duties to Plaintiffs as minority shareholders, including the duty of candor and the duty to disclose material information in connection with transactions affecting their shares. Having affirmatively represented to Plaintiffs in June 2022 that Streck shares were valued at approximately $27 per share, Defendants assumed a continuing fiduciary obligation to correct that representation when they obtained the

December 31, 2022 Stout valuation of $61.98 per share, the Bank of America fairness opinion, and the Madison transaction price of $70.10 per share. Under Nebraska law, a fiduciary who speaks on a subject must speak fully and truthfully, and the duty to correct a material misrepresentation persists until the truth is disclosed. *See* Restatement (Second) of Torts § 551(2)(c); *see also* Neb. Rev. Stat. § 21-20,104 (directors shall act in good faith and with the care of an ordinarily prudent person). Defendants have never corrected their false valuation representation. The fiduciary breach is therefore ongoing.

247. Defendants did not merely fail to correct their misrepresentation — they actively concealed the true valuations. The Stout valuation reports were redacted in every document produced or filed by Defendants, including in the Bill of Exceptions in CI 23-886. Plaintiffs did not see the unredacted Stout valuations until February 2025, when the Bill of Exceptions was publicly accessible on the Nebraska Judicial Branch's JUSTICE system before being resealed at Defendants' request. Defendants' own counsel admitted in a May 16, 2025 communication that the Bill of Exceptions "became public" upon its transmission to the appellate court. Where a defendant's active concealment prevents discovery of the fraud, the statute of limitations does not begin to run until the plaintiff discovers or reasonably should have discovered the fraud. Neb. Rev. Stat. § 25-207; *Fritsch v. Hilton Hotels Corp.*, 295 Neb. 171, 187 (2016). Because Defendants redacted the very documents that would have revealed the fraud, they cannot now claim that Plaintiffs should have discovered it sooner.

248. Nonetheless, due to the particularity requirements imposed on 10-b5 claims, Plaintiff deems it prudent to argue that tolling would apply even if her claims did not involve a continuing concealment. Those pleadings follow below.

### *1. Statute of Repose*

249. The violation occurred no later than February 20, 2023, when the Confidential Settlement Agreement signed and Plaintiff's and her sons were

required by a fraudulently induced agreement to be transferred for cash consideration. This action is filed within five years of that date. The statute of repose presents no bar.

### *2. The Two-Year Discovery Period: Plaintiff Did Not and Could Not Have Discovered the Fraud Before 2025*

250. Under *Merck*, the two-year clock begins when "the plaintiff did in fact discover, or a reasonably diligent plaintiff would have discovered, the facts constituting the violation—whichever comes first." 559 U.S. at 653. "[D]iscovery" requires more than "inquiry notice" or "storm warnings"; it requires actual discovery of, or the ability to discover through reasonable diligence, the "facts constituting the violation"—i.e., "the facts showing scienter." *Id.* at 648–49. The Supreme Court specifically rejected the "inquiry notice" standard, holding that "the limitations period does not begin to run until the plaintiff thereafter discovers or a reasonably diligent plaintiff would have discovered 'the facts constituting the violation,' including scienter—irrespective of whether the actual plaintiff undertook a reasonably diligent investigation." *Id.* at 653.

251. Plaintiff did not discover, and could not through the exercise of reasonable diligence have discovered, the facts constituting the violations alleged herein until 2025, when the unredacted Bills of Exception in *Streck, Inc. v. Carol Ryan, et al.*, Case No. CI 23-886 (Sarpy County District Court), became publicly available. This action is filed within two years of that discovery. The specific facts that Plaintiff discovered for the first time in 2025 include:

252. (a) The Stout valuation figures—as admitted by Streck in its own pleading. The Appraisal Litigation complaint, at paragraph 19, contained Streck's own admission that "Stout valued Streck at $824,000,000 as of June 30, 2019; $940,000,000 as of June 30, 2020; $1,130,000,000 as of June 30, 2021, and $1,270,000,000 as of June 30, 2022." These figures were redacted when the

complaint was originally filed, and the amended complaint was sealed on May 19, 2023 by order of Judge Cox. Plaintiff had no access to the unredacted complaint language until the twelve volumes of Bills of Exception were filed as a public record in 2025, revealing for the first time that the $27 per share representation was false by a factor of more than 2x. (Complaint at §§ 52–54.) Critically, neither the actual Stout valuation reports nor the BofA Securities fairness opinion were included as exhibits in the BOE or otherwise made available to Plaintiff—only Streck's admissions about their conclusions. Defendants never produced the Stout valuation reports at a time when it would have been pertinent to a decision of Plaintiff and they have failed to correct the false statement about the value of Streck being $27 per share. The strategic decision to keep the Bills of Exceptions out of the record—while not redacting enough of their conclusions to prosecute the Appraisal Litigation—is itself evidence of Defendants' continuing concealment of the full scope of the fraud. Any motion practice to seal the exhibits in this case are also evidence of continuance of the fraud.

253. (b) The magnitude of the gap between the $27 representation and the actual value. It was only upon reviewing the unredacted BOE that Plaintiff could calculate that the 2021 Stout valuation of $1.13 billion equated to approximately $60 per share, and that the June 2022 Stout valuation of $1.27 billion equated to approximately $67.60 per share—confirming that the $27 figure Defendants communicated at mediation was not merely imprecise but was a deliberate and material understatement.

254. (c) The deposition testimony and transactional documents establishing scienter. The BOE contained, among other things, the depositions of Defendants Gies and Gates, the Janicek valuation templates (Exhibit 33) and EBITDA analysis (Exhibit 38), the Bio-Rad LOI details, Gies's testimony that Connie Ryan told Bio-Rad "they could not negotiate," Gates's testimony that there was "no agenda item" for antitrust analysis, and Gies's admission that he "probably could have made more personally" selling at $2 billion than

buying at $1.6 billion. These facts, which establish both the falsity of Defendants' representations and their scienter, were not available to Plaintiff before the BOE was filed.

255. (d) The rollover magnitude and structure—were not available to Plaintiff until after they would have been useful to her (i.e. before she signed the MSM).

### 3. *The Fraud Was Self-Concealing*

256. The nature of Defendants' scheme was such that the fraud concealed itself. This is not a case where a plaintiff failed to investigate red flags; it is a case where Defendants' half-truths were specifically designed to prevent Plaintiff from recognizing that she was being defrauded. See *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 363 (1991) (recognizing that the discovery rule accounts for situations where the fraud is inherently self-concealing). Defendants' selective disclosures—the shareholder letters, the October 17 call, the Information Statement—were not evidence of transparency; they were the instruments of concealment. By disclosing enough to appear forthcoming while withholding the specific facts that would have revealed the fraud, Defendants ensured that a reasonably diligent plaintiff in Plaintiff's position would not have discovered the violation.

257. Several features of the scheme made it inherently self-concealing:

258. (a) **Streck was a closely held corporation with no public financial reporting.** Streck did not file periodic reports with the SEC, did not publish financial statements, and did not disclose valuation information to shareholders. Plaintiff had no independent means of determining the value of her shares. She was entirely dependent on the information Defendants chose to provide—and Defendants chose to provide false information.

259. (b) **Defendants actively concealed the Stout valuations, and Plaintiff was refused access at every step.** The Stout valuations were Streck's own annual independent valuations, prepared at Streck's expense and

available to the Board. The Board never distributed them to shareholders. Plaintiff affirmatively and repeatedly sought valuation information for her Streck shares and was refused at every turn—by Streck, by Defendant Connie Ryan, and by FNBO as Trustee. Instead of providing the Stout valuations showing $60–$68 per share, Defendants provided Plaintiff with the false $27 figure at mediation, and FNBO provided an irrelevant "in house valuation" of $20 per share when it could have demanded the Stout valuation from Streck. When the Stout valuation figures finally appeared in the Appraisal Litigation complaint, they were redacted. When the amended complaint was filed, it was sealed. And even then, Defendants included only Streck's admissions about the Stout conclusions in the complaint—the actual Stout valuation reports and the BofA Securities fairness opinion were strategically excluded from the record, because Defendants knew those documents would be "torn apart" if subjected to outside scrutiny. Stacy never received a copy of any Stout valuation report or the BofA fairness opinion at the pertinent time (i.e. before she was "locked in" to selling her shares for $39 per share). Defendants took affirmative steps at every stage to prevent Plaintiff from learning what the company was actually worth before they induced her to be held to a $39 per share value, and they rebuffed any efforts to find out the true value of Streck.

260. (c) **The Information Statement was designed to appear complete.** The January 24, 2023 Information Statement was a 20+ page document with the hallmarks of a thorough corporate disclosure: it described the transaction structure, disclosed the BofA fairness opinion, discussed the Reinvestment Option, and referenced the competing proposal. A reasonable shareholder would have understood this to be a complete disclosure of material information. It was not. But its apparent completeness was precisely what made the omissions undiscoverable through reasonable diligence.

261. (d) **Defendant Connie Ryan's October 17, 2022 denial of rollover participation was an affirmative lie.** A reasonably diligent shareholder who heard Connie Ryan state on a recorded call that "Matt and I will be selling

our shares" and answer "no" to the rollover question would have had no reason to doubt that representation. The January 24 Information Statement later disclosed the rollover, but its disclosure was useless at that point. The Board had already allowed Larry Gies and Connie Ryan to approve "our deal" by the time it was disclosed.

262. (e) **Plaintiff exercised reasonable diligence and was thwarted at every step.** Plaintiff did not sit idle. She affirmatively and repeatedly sought valuation information for her Streck shares from Defendants and from FNBO in its capacity as Trustee. Each request was refused. Streck never provided any shareholder with copies of any Stout valuation report. FNBO, rather than obtaining or demanding the Stout valuations on behalf of its beneficiary, provided Plaintiff with an irrelevant "in house valuation" of $20 per share. The actual Stout valuation reports have never been produced to Plaintiff or to any nonvoting shareholder before they could use it. They were only shared after Connie Ryan and Larry Gies had locked in "our deal." A plaintiff cannot discover what the defendants have locked away, and reasonable diligence does not require a plaintiff to overcome a defendant's active refusal to produce the very documents that would reveal the fraud.

### *4. The Shareholder Letters Did Not Trigger Inquiry Notice*

263. Defendants will argue that the September–October 2022 shareholder letters disclosing the $1.3–$1.6 billion Madison Transaction should have put Plaintiff on "inquiry notice" that her shares were worth more than $27 per share. This argument fails for four independent reasons.

264. First, as the Supreme Court held in *Merck*, the applicable standard is not "inquiry notice" but actual discovery of "the facts constituting the violation," including scienter. 559 U.S. at 648–49. Even if the shareholder letters prompted questions, they did not reveal—and could not have revealed—that the $27 representation was knowingly false, that the Stout valuations showed $60+ per share, that the Bio-Rad offer was $2 billion, that Connie Ryan

had lied about rollover, or that the antitrust rationale was fabricated and/or irrelevant to the pertinent question about whether the Madison Transaction was fair. The facts constituting the violation—and particularly the facts establishing scienter—were locked inside sealed and redacted court filings, deposition transcripts, and transactional documents that Plaintiff could not access until the BOE was filed in 2025.

265. Second, the shareholder letters disclosed an enterprise-level transaction price ($1.3–$1.6 billion) but did not disclose a per-share value. Streck had approximately 18 million total shares outstanding across multiple classes with different rights. A reasonable shareholder who was not a financial analyst—and who had been told by a Board-approved mediation statement that shares were worth "just under $27"—would not necessarily have calculated that a $1.3 billion enterprise value implied $59+ per share for her stock. The duty to speak accurately was on Defendants, not on Plaintiff to perform a forensic analysis of generic shareholder communications to uncover the fraud perpetrated against her in a separate, specific context.

266. Third, even if the shareholder letters had triggered a duty to inquire, Plaintiff did inquire—and was stonewalled. Plaintiff affirmatively and repeatedly requested valuation information from Streck and from FNBO in its capacity as Trustee. Every request was refused. Streck never produced the Stout valuation reports. FNBO never obtained the Stout reports on Plaintiff's behalf. When Plaintiff tried to ascertain the value of her shares, Defendants and their fiduciary gave her fabricated numbers: $27 at mediation, $20 from FNBO. A defendant who refuses to answer the plaintiff's inquiries cannot then argue that the plaintiff should have inquired more diligently. The "inquiry notice" defense presupposes that reasonable inquiry would have been productive; here, reasonable inquiry was met with active obstruction.

267. Fourth, and most fundamentally, Defendants cannot use their own half-truths to trigger the statute of limitations. The entire theory of this Count is that Defendants' selective disclosures were designed to appear transparent

while concealing the material facts. If those same disclosures could simultaneously serve as "inquiry notice" that would bar Plaintiff's claims, the half-truth doctrine would be a dead letter: a defendant could make a misleading disclosure, wait two years, and then argue that the misleading disclosure itself started the clock. The law does not reward that strategy. See *New England Health Care Employees Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003) (where defendant's own conduct prevents discovery, limitations period is tolled); *Young v. Lepone*, 305 F.3d 1, 9 (1st Cir. 2002) ("a defendant may not benefit from its own fraudulent concealment").

### *5. Equitable Tolling and Fraudulent Concealment*

268. In the alternative, equitable tolling applies to suspend the limitations period. Where a defendant's own fraudulent concealment prevents the plaintiff from discovering the cause of action, the statute of limitations is tolled until the plaintiff discovers or should have discovered the fraud. *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946); *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 348 (1874) ("[W]here the party injured by the fraud remains in ignorance of it without any fault or want of diligence or care on his part, the bar of the statute does not begin to run until the fraud is discovered.").

269. Defendants engaged in affirmative acts of concealment throughout the relevant period: refusing Plaintiff's repeated requests for valuation information; providing her with fabricated and irrelevant valuations ($27 per share at mediation, $20 per share from FNBO); redacting the Stout valuation figures from court filings; sealing the Appraisal Litigation complaint; strategically excluding the actual Stout valuation reports and BofA fairness opinion from the litigation record even while admitting their conclusions; affirmatively lying about the rollover on October 17, 2022; burying and mischaracterizing the Bio-Rad offer in the Information Statement; and fabricating an antitrust rationale for rejecting a $2 billion competing offer. These were not passive omissions; they were deliberate, sustained acts of

concealment designed to prevent Plaintiff from discovering the truth—and they continued even after litigation commenced, as evidenced by the decision to keep the underlying valuation documents out of the BOE. Equitable tolling applies from the date of the CSA's execution through at least the date in 2025 when Plaintiff first obtained access to the unredacted Bills of Exception, which contained the first evidence—Streck's own admissions about the Stout conclusions and the deposition testimony establishing scienter—from which the fraud could be discovered.

**J. Prayer for Relief For 10b-5 claims**

270. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against all Defendants, jointly and severally, and award:

271. (a) Compensatory damages in an amount to be proven at trial;

272. (b) Rescission of the Confidential Settlement Agreement and Mediation Settlement Memorandum, or rescissory damages in the alternative;

273. (c) Prejudgment and post-judgment interest at the maximum rate allowed by law;

274. (d) Reasonable attorney's fees, costs, and expenses of this action; and

275. (e) Such other and further relief as this Court deems just and equitable.

**COUNT 2**

***(In the Alternative, Pursuant to Fed. R. Civ. P. 8(d)(2)–(3):***

***Rescission Based on Material Breach of Contract –***

***Breach of Confidentiality Provisions)***

***(Against Defendant Streck, Inc.)***

276. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

277. This Count is pleaded in the alternative pursuant to Federal Rule of Civil Procedure 8(d)(2) and 8(d)(3). Plaintiff's primary position, as set forth in all other counts, is that the Confidential Settlement Agreement dated February 20, 2023 (the "Agreement") is void or voidable on grounds of fraud, fraudulent inducement, and/or ultra vires corporate action, and that no valid and enforceable agreement exists. Plaintiff does not, by asserting this alternative Count, concede or admit the validity or enforceability of the Agreement. "A party may state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3).

278. In the alternative, and solely in the event the Court determines that the Confidential Settlement Agreement is otherwise valid and enforceable, Plaintiff alleges that Defendants' own material breach of the agreement independently entitles Plaintiff to rescission.

279. On or about February 20, 2023, Plaintiff Stacy Ryan, Sean Coffey, Timothy Coffey, John Ryan Coffey, and Streck, Inc. entered into the Confidential Settlement Agreement. That agreement was based on, but superseded the Mediated Settlement Agreement dated June 17, 2022 except the price for the shares was updated to reflect $70.10 a share.

280. Section 6 of the Agreement, entitled "Confidentiality," expressly required each Party to "keep confidential and not to disclose the terms and conditions of this Agreement to third parties," subject only to narrow exceptions for disclosures (a) required by applicable law, (b) compelled by judicial or administrative process, or (c) made in any action brought by a Party in pursuit of its rights or remedies under the Agreement. The Mediated Settlement Agreement likewise had required confidentiality in that it committed the parties to agree to a "full confidentiality clause."

281. Section 6 further required that in the event of any permitted disclosure under any exception, "the disclosing Party shall disclose only such information

that it believes it is required to disclose" and "shall give the other Parties at least seven (7) days' advance written notice of such intended disclosure so that such Party may seek a protective order."

282. In breach of Section 6, and the "full confidently clause" Mediated Settlement requirement when it was purportedly in effect, Defendants disclosed, or caused or permitted to be disclosed, confidential terms and conditions of the Agreement—including Plaintiff's and her sons' payment details, bank account numbers, and other financial information—in connection with litigation proceedings and filings involving members of the Ryan family, without Plaintiff's consent and without providing the required seven-day advance written notice.

283. Such disclosures were not authorized by any of the narrow exceptions set forth in Section 6 of the Agreement. To the extent Defendants contend any exception applied, Defendants failed to comply with the procedural safeguards required by Section 6, including the mandatory seven-day advance written notice and the obligation to limit disclosure to only that information required to be disclosed.

284. Despite Plaintiff's express requests for redaction and protection of her private financial information, Defendants continued to allow such information to remain publicly available and took no meaningful corrective action, and did so in an intentionally misleading way such that the reader would assume that Plaintiff and her sons were given the same opportunity and terms with respect to the sale of their Streck shares as the other shareholders were.

285. The confidentiality provisions of the Agreement were a material term of the bargain. Plaintiff and her sons agreed to dismiss their pending litigation, release their claims against Streck and its officers and directors, waive their rights as shareholders, and accept the consideration set forth in the Agreement

in material reliance upon Defendants' promise that the terms and conditions of the Agreement—including all financial details—would remain confidential.

286. The disclosures resulted from the exchange with third parties by Streck, Inc. of its June 30, 2022 and 2021 Financial Statements which contained a description of the Mediated Settlement Agreement and Confidential Settlement Agreement terms as follows:

**Streck, Inc. and Subsidiary**

**Notes to Consolidated Financial Statements**
**June 30, 2022 and 2021**

*Construction*

During 2021, the Company entered into contracts for the construction of buildings and industrial equipment totaling approximately $13,000,000 to $16,000,000. Spending on these two contracts at June 30, 2022 was approximately $9,600,000. Both projects are expected to be completed during the fiscal year ending June 30, 2023.

*Repurchase of Stock*

The Company has agreed in principle to purchase all shares owned and shares to be distributed to a beneficiary of a trust which is a current shareholder of the Company, and to other trusts which are shareholders and benefit certain children of this beneficiary. In consideration of the share purchase, the **beneficiary and beneficiary's children will drop all lawsuits that have been brought or could have been** brought against the Company, its current and former officers, directors, employees and related entities, attorneys, and insurers through the time the shares are purchased. Streck and the beneficiaries have agreed that the purchase price will be $38,000,000 upon the distribution of shares from the trusts. The Company is not aware of the final number of shares that will be purchased nor the amount that will be applied to the settlement of the lawsuits filed by the beneficiaries. No amounts have been recognized in the financials statements as the execution of this transaction is contingent upon shares being released from the trust which has not yet occurred.

287. Defendants' breach of the confidentiality provisions was material and went to the essence of the Agreement if it is determined it is enforcable. Had Plaintiff known that Defendants would disclose her private financial information, including bank account numbers and payment details, in disregard of their express contractual obligations, she would not have entered into the Agreement.

288. Plaintiff hereby elects rescission of the Agreement on the independent and alternative ground that Defendants materially breached the

confidentiality provisions thereof if it is ever determined that the Confidential Settlement Agreement is enforcable.

289. Plaintiff is entitled to rescission of the Agreement and restoration to her pre-Agreement position, including reinstatement of all claims released under Sections 4.1 through 4.6 of the Agreement, return of all consideration paid or benefits received by Defendants pursuant to the Agreement, and an accounting of all proceeds attributable to Plaintiff's and her sons' shares.

290. Further, to the extent any Defendant seeks to enforce the releases, covenants, or any other provision of the Agreement as a defense to any claim asserted herein, Defendants are estopped from doing so by their own prior material breach of the Agreement. "A material breach will excuse the nonbreaching party from its performance of the contract." *Siouxland Ethanal, LLC v. Sebade Bros.,LLC,* 290 Neb. 230,236 (2015). Further, "[a] material breach is a failure to do something that is so fundamental to a contract that the failure to perform that obligation defeats the essential purpose of the contract or makes it impossible for the other party to perform under the contract." *Id.*

291. Accordingly, to the extent the Agreement is found to be otherwise valid, Defendants' material breach of Section 6 independently bars Defendants from enforcing the releases and from relying upon any provision of the Agreement as a shield against Plaintiff's claims.

## COUNT 3

## (Rescission Based on Fraud)

*(All Plaintiffs Against All Defendants other than FNB)*

292. Plaintiffs realleges and incorporate by reference all preceding paragraphs as if fully set forth herein.

293. Defendants made material misrepresentations and omissions to Plaintiff and her sons in connection with the Mediation Settlement Memorandum and Confidential Settlement Agreement, as alleged above.

294. Defendants' misrepresentations and omissions were made with knowledge of their falsity or with reckless disregard for the truth.

295. Defendants intended that Plaintiff and her sons rely on their misrepresentations and omissions.

296. Plaintiff and her sons reasonably relied on Defendants' misrepresentations and omissions in signing the Confidential Settlement Agreement.

297. Plaintiff and her sons have been damaged as a direct and proximate result of Defendants' fraud.

298. Plaintiff and her sons are entitled to elect rescission of the Confidential Settlement Agreement and restoration to their pre-Agreement position, including reinstatement of all claims released and return of all ill-gotten gains paid to any Defendant through an accounting.

**COUNT 4**

**(Fraud)**

*(All Plaintiffs Against Streck, Connie Ryan, Gies and Akey)*

299. Plaintiff reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

300. Defendants Streck, Connie Ryan, Gies, and Akey made material misrepresentations and omissions to Plaintiff and her sons, as alleged above.

301. These misrepresentations were false and the omissions were misleading.

302. Defendants knew these representations were false or made them with reckless disregard for the truth.

303. Defendants intended that Plaintiff rely on these misrepresentations and omissions.

304. Plaintiff reasonably relied on Defendants' misrepresentations and omissions.

305. As a direct and proximate result of Defendants' fraud, Plaintiff and her sons have suffered damages in an amount to be proven at trial, including but not limited to the difference between what Plaintiff and her sons received and the true value of their shares and claims.

## COUNT 5

## (Violation of Nebraska Securities Act)

*(Plaintiff Against Streck, Director Defendants, Connie Ryan, Gies, and Akey)*

306. Plaintiff realleges and incorporate by reference all preceding paragraphs as if fully set forth herein. Neb. Rev. Stat. 8-1102(1) makes it unlawful for any person, in connection with the offer, sale, or purchase of any security, to: (a) employ any device, scheme, or artifice to defraud; (b) make any untrue statement of a material fact or omit to state a material fact necessary to make the statements made not misleading; or (c) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

307. The shares of Streck stock are securities within the meaning of the Nebraska Securities Act.

308. Defendants, in connection with the purchase of Plaintiff and her sons' securities through the Confidential Settlement Agreement, employed devices, schemes, and artifices to defraud Plaintiff and her sons.

309. Defendants made untrue statements of material facts and omitted to state material facts necessary to make the statements made not misleading, as alleged above.

310. Defendants engaged in acts, practices, and courses of business which operated as a fraud and deceit upon Plaintiff and her sons.

311. As a direct and proximate result of Defendants' violations of the Nebraska Securities Act, Plaintiff and her sons have suffered damages in an amount to be proven at trial.

312. Pursuant to Neb. Rev. Stat. 8-1118(2), Plaintiff and her sons are entitled to recover the consideration paid for their securities together with interest at the rate determined under section 45-104 from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the securities, upon the tender of such securities.

313. Even if Defendants argue that 8-1118 only protects buyer's § 8-1102's anti-fraud provision prohibits fraud "in connection with the offer, sale, **or purchase** of any security" — covering both buyers AND sellers as potential victims.

314. Nebraska modeled its Securities Act after the Uniform Securities Act but **intentionally omitted U.S.A. § 410(h)**, which states: "rights and remedies provided by this act are in addition to any other rights or remedies... **but this act does not create any cause of action not specified in this section**."

315. By NOT including § 410(h), the Nebraska Legislature signaled it did NOT intend to preclude implied remedies under § 8-1102.

316. *Hooper v. Freedom Fin. Grp.* 280 Neb. 211 (2010) holds Nebraska's Securities Act "should be liberally construed to afford the greatest possible protection to the public."

317. Defendants reserve their right to elect recission of the Confidential Settlement Agreement and/or to pursue damages all as allowed under the Nebraska Securities Act.

**COUNT 6**

**(Breach of Fiduciary Duty)**

*(Plaintiff Against Connie Ryan, Gies, Carrie Kreifels, Matt Kreifels and the Director Defendants)*

318. Plaintiff realleges and incorporate by reference all preceding paragraphs as if fully set forth herein.

319. As controlling shareholders, Connie Ryan and Gies owed fiduciary duties of loyalty, care, and good faith to Plaintiff and her sons as minority shareholders.

320. As directors of Streck, Defendants Gates and Fairfield owed fiduciary duties of loyalty, care, and good faith to Plaintiff and her sons as shareholders.

321. As shareholders in a closely held corporation, Larry Gies, Matt Kreifels and Carrie Kreifels owned fiduciary duties of loyalty, care, and good faith to their fellow shareholders.

322. Connie Ryan and Gies breached their fiduciary duties by:

a. Concealing the true value of Streck shares from Plaintiff of her sons; and

b. Inducing Plaintiff to sell their shares and release their claims based on material misrepresentations and omissions;

323. The Director Defendants breached their fiduciary duties by:

a. Approving the Madison Transaction despite knowing that it was structured to benefit controlling shareholders at the expense of minority shareholders;

b. Failing to give any meaningful consideration to not selling Streck;

c. Failing to give any meaningful consideration to the $400 million higher offer from Bio-Rad; and

e. Signing the Securities Purchase Agreement on February 10, 2023 without any meaningful analysis of alternatives.

f. Approving the sale of voting control shares from Connie Ryan to Larry Gies.

324. Gies, Matt Kreifels and Carrie Kreifels breached their fiduciary duties of care by participating in a transaction for their personal benefit over the benefit of their fellow shareholders.

325. As a direct and proximate result of Defendants' breaches of fiduciary duty, Plaintiff and her sons have suffered damages in an amount to be proven at trial.

326. Plaintiff reserves her right to subsequently elect her remedies to rescind the Madison Transaction or to pursue damages against the above defendants for this count.

**COUNT 7**

**(Aiding and Abetting Breach of Fiduciary Duty)**

*(Plaintiff Against FNB)*

327. Plaintiff realleges and incorporate by reference all preceding paragraphs as if fully set forth herein.

328. Connie Ryan and Gies breached their fiduciary duties to Plaintiff as alleged above.

329. FNB knew that Connie Ryan and Gies owed fiduciary duties to Plaintiff and her sons.

330. FNB knowingly participated in and substantially assisted Connie Ryan and Gies in their breaches of fiduciary duty by Participating in the scheme to induce Plaintiff and her sons to sign the Confidential Settlement Agreement based on material misrepresentations and omissions.

331. As a direct and proximate result of FNB's aiding and abetting, Plaintiff and her sons have suffered damages in an amount to be proven at trial.

**COUNT 8**

**(Breach of Fiduciary Duty)**

*(All Plaintiff's Against FNB)*

332. Plaintiff and her sons reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

333. FNBO at relevant times served as Trustee of the Eileen Ryan Marital Trust, which held Streck shares for the benefit of Plaintiff and her sons.

334. As Trustee FNB owed fiduciary duties to Plaintiff and her sons under the Nebraska Uniform Trust Code, including the duties of loyalty (Neb. Rev. Stat. 30-3867), impartiality (Neb. Rev. Stat. 30-3880), prudent administration (Neb. Rev. Stat. 30-3868), and the duty to inform and account (Neb. Rev. Stat. 30-3883).

335. FNB breached its fiduciary duties by:

a. Failing to obtain accurate valuation information for trust assets despite Stacy Ryan's requests;

b. Providing Stacy Ryan with a materially inaccurate "in house valuation" of $20 per share;

c. Failing to inform Stacy Ryan of material information regarding the Madison Transaction despite FNB's involvement in Transaction discussions; and

d. Failing to protect Stacy Ryan's interests as beneficiary while participating in or having knowledge of the Transaction.

336. As a direct and proximate result of FNB's breaches of fiduciary duty, Stacy Ryan has suffered damages in an amount to be proven at trial.

**COUNT 9**

**(Aiding and Abetting Fraud)**

*(Stacy Ryan Against FNBO)*

337. Plaintiff Stacy Ryan realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

338. Streck, Connie Ryan, and Akey committed fraud against Stacy Ryan as alleged herein.

339. FNBO knew that Streck was concealing material valuation information from Stacy Ryan.

340. FNBO intentionally did not demand any information that would allow it or any beneficiaries of the Eileen Ryan Trust to determine the true value of Streck at any time during which it acted as Trustee.

341. FNBO intentionally deferred to Connie's wishes and failed to distribute Streck Shares to the beneficiaries because it desired to please Connie, because she controlled millions of deposits held by FNBO.

342. FNBO, as a pretext for continuing to receive trustees fees on hundreds of millions of dollars worth of Streck shares, intentionally delayed the distribution of Streck shares to beneficiaries.

343. When it did issue stock powers to transfer shares, it did so only to facilitate the Madison Transaction as, upon information and belief, Connie demanded and at all times prior to that date delayed the delivery of stock powers so that Connie could control when such shares were distributed.

344. FNBO, even knowing that Larry Gieswould vote his controlling position in favor of a transaction with a company he controlled, and even knowing that a competitive offer had been received, did not even bother to request that Connie or the "independent" Board members reconsider approving the transaction.

345. FNBO, upon information and belief, did not even request information as to the value of the competing offer.

346. FNBO, did not even request that Connie or the "independent" board members consider the option of not selling Streck.

347. FNBO also substantially assisted in the fraud against Plaintiff and her sons by providing Stacy Ryan with a false "in house valuation" of $20 per shares while rebuffing her attempts to compel it to obtain information that would actually help her.

348. As a direct and proximate result of FNB's aiding and abetting, Plaintiff and her sons suffered damages in an amount to be proven at trial.

**COUNT 10**

**(Declaratory relief re Breach of Contract)**

*(Stacy Ryan Against Streck)*

349. Plaintiff Stacy Ryan realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

350. In 2012, Stacy Ryan and Streck entered into a Stock Purchase Agreement ("SPA") pursuant to which Streck redeemed Stacy Ryan's shares.

351. The SPA represented that the purchase price was "determined according to paragraph 9 of the Redemption Agreement," which required payment of fair market value as set forth in the most recent valuation prepared by Juris Valuation Advisors, LLC.

352. Streck breached the SPA by paying Stacy Ryan based on a 2011 JVA valuation when a July 27, 2012 JVA valuation showing higher share values existed at the time of the SPA.

353. The Nebraska Supreme Court reversed the dismissal of this claim and remanded for further proceedings in Ryan v. Streck, Inc., 309 Neb. 98 (2021).

354. As a direct and proximate result of Streck's breach, Stacy Ryan has been damaged in an amount to be proven at trial in this court or, at her election, in Sarpy County District Court, including the difference between the

amount she was paid and the fair market value of her shares at the time of the 2012 SPA, plus pre- and post-judgment interest.

**COUNT 11**

**(Declaratory and Equitable Relief –**

**Conflicting Interest Transaction Neb. Rev. Stat. § 21-2,120(1))**

*(Stacy Ryan Against Streck, Connie and Giesand any other fiduciary Defendant benefiting from the Madison Transaction)*

355. Under the Nebraska Model Business Corporation Act ("NMBCA"), a "director's conflicting interest transaction" is a transaction effected by the corporation in which, at the relevant time, the director is a party, has a material financial interest, or knows that a related person has a material financial interest. Neb. Rev. Stat. § 21-2,120(1).

356. The Confidential Settlement Agreement and the subsequent Madison Transaction were classic conflicting interest transactions. Larry and Connie Streck, as controlling shareholders and directors of Streck, Inc., stood on both sides of these transactions: in the Confidential Settlement Agreement, they purchased Plaintiff's shares and released her claims, and in the Madison Transaction, they sold Streck at a price that benefited them to the detriment of Plaintiff and her sons.

357. 'Under Neb. Rev. Stat. § 21-2,121(b), a director's conflicting interest transaction "may not be the subject of equitable relief, or give rise to an award of damages" against the director *only if* one of three safe harbors is satisfied: (1) directors' action in compliance with § 21-2,122; (2) shareholders' action in compliance with § 21-2,123; or (3) the transaction "*is established to*

*have been fair* to the corporation." Neb. Rev. Stat. § 21-2,121(b)(3) (emphasis added).

358. The statute's use of the passive voice—"is established to have been fair"—places the burden squarely on the conflicted fiduciaries. The burden of proof is on the party holding a confidential or fiduciary relationship to establish the fairness, adequacy, or equity of the transaction with the party who he holds such relation." *Evans ex re. D&E Copiers v. Engelhardt*, 246 Neb. 323, 327-28. 518 N.W.2d 648, 652 (1994).

359. The NMBCA defines "fair to the corporation" to mean "that the transaction as a whole was beneficial to the corporation, taking into appropriate account whether it was (i) fair in terms of the director's dealings with the corporation and (ii) comparable to what might have been obtainable in an arm's length transaction." Neb. Rev. Stat. § 21-2,120(6).

360. Defendants Larry Giesand Connie Ryan cannot carry their burden of proving entire fairness. The process was fundamentally unfair: Defendants induced Plaintiff to settle her claims and surrender her shares while concealing material information about the pending Madison Transaction and the true value of Streck, Inc and the competitive offer of Bio-Rad.

361. The NMBCA's structure is clear: if none of the three safe harbors in § 21-2,121(b) is satisfied, the transaction "may be the subject of equitable relief" and "may give rise to an award of damages." The statute does not say the transaction is valid unless proven unfair—it says the transaction *can be attacked* unless one of the safe harbors is satisfied.

362. Because they cannot prove either fair dealing or fair price, the fairness safe harbor under § 21-2,121(b)(3) is unavailable, and the transactions may be the subject of equitable relief—including rescission or rescissory damages restoring Plaintiff and her sons to the position they would have occupied but

for Defendants' breaches of fiduciary and/or requiring an equitable accounting of profits received by any Defendant.

**COUNT 12**

**(Declaratory Judgment Ultra Vires)**

*(Against Streck and Madison III and Madison II and any of their affiliates participating in the Madison Transaction)*

363. On February 3, 2023, the Streck, Inc. Board of Directors held a Special Meeting and approved the Securities Purchase Agreement with Madison Streck Holdings III LLC (the "Madison Transaction").

364. The Board-approved structure included a rollover mechanism through Madison Streck Holdings II LLC ("Madison II"), which allowed participating shareholders to exchange a portion of their Streck shares for membership interests in Madison II rather than receiving cash.

365. On February 20, 2023—one day before the Madison Transaction was scheduled to close—Defendant Connie Ryan presented Plaintiff and her sons with the Confidential Settlement Agreement and demanded her signature which specifically precluded Plaintiff and her sons the opportunity to participate in the rollover transaction that the Board and Voting Shareholders approved for all shareholders.

366. Defendant Connie Ryan executed this Confidential Settlement Agreement in her capacity as President and CEO of Streck, Inc., purporting to act with corporate authority, when she actually had no such authority.

367. A corporate officer's authority derives from the board of directors. When an officer acts beyond the scope of board authorization, the resulting

corporate act is unauthorized and voidable at the election of the injured party.

368. The Board approved a transaction structure that included rollover opportunities through Madison II. The Board did not authorize Defendant Connie Ryan to unilaterally exclude certain shareholders from those opportunities while reserving them for herself and her family.

369. The complaint filed in the Appraisal Rights litigation by Streck conceals that Connie Ryan, in her role as president of Streck, and through her fellow officer Akey, made a different deal with Stacy Ryan and her sons than that authorized by the board and the shareholders by fraudulently inducing Stacy Ryan and her sons to sign the Confidential Settlement Agreement.

370. It is a badge of fraud that Paragraph 17 of the Appraisal Rights Complaint lists Stacy and her children's shares in Streck "as beneficially owned by the Eileen Ryan GST trust" at the time of the closing, as having received payment as authorized by the board at closing, and as "not electing appraisal rights" (and implicitly therefore voluntarily not participating in the rollover transaction). The true facts are that Plaintiff and her sons were not allowed to participate in the Madison Transaction as approved by the Board. This is because they were never allowed to rollover their interests because Streck and Connie Ryan made them to agree to release Streck and agree not to have any further rights as shareholders and to release litigation on February 20, 2023 or else receive $39 for their shares, rather than participate in the separate board approved $70.10 per share transaction.

371. An unauthorized corporate act is void *ab initio* if the corporation lacked power to perform it, or voidable at the election of the injured party if the officer lacked authority to bind the corporation to those terms.

372. In the Alternative, the entire Madison Transaction exceeded Connie Ryan's and Curtis Akey's authority as corporate officers because they were only authorized to close the Madison Transaction if all shareholders received the exact same benefit of the bargain, specifically $70.10 equivalent value per share and the right of shareholders to roll their Streck shares into Madison II as Connie did.

373. Accordingly, at the election of Plaintiff, Plaintiff expressly reserves the right to elect to void the entire Madison Transaction as *Ultra Vires* if they so subsequently elect to pursue such remedy.

COUNT 13

INVASION OF PRIVACY

(Plaintiff Against All Defendants)

374. The disclosure and continued disclosure of Plaintiffs bank account information and other confidential information in Ryan family related litigation caused by Defendants or allowed by Defendants constitutes an intentional intrusion upon the solitude of Plaintiffs and her sons, because each Defendant has a duty, and their counsel as their agents have a duty under applicable court rules and ethics rules, to redact said information.

375. The intrusion is highly offensive because it provides a means for others to pry into Plaintiff's and her sons' private financial matters and risks identity fraud or worse.

376. These matters are not of legitimate public concern, and even after requests for redaction to FNBO and Streck, they have continued to allow this information to be publicly available without Plaintiff's consent.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully request that the Court enter judgment in her favor and against Defendants as they subsequently elect in the alternative or otherwise as follows:

a. Rescission of the Confidential Settlement Agreement and restoration of Plaintiff and her sons to their pre-Agreement position;

b. Alternatively, compensatory damages measured by the difference between what Plaintiff and her sons received ($70.10 per share) and the fair value of their shares and the fair value of claims asserted the Share Value Litigation and the Bylaws Litigation.

c. Alternatively, compensatory damages measured by the difference between what Plaintiff and her sons received ($70.10 per share) and the value that would have been received had Defendants not breached their fiduciary duties, including but not limited to the $111.11 per share price represented by the Bio-Rad offer

d. An equitable accounting of all ill-gotten gains obtained by any of the Defendants including DS Intermediate, Inc. and Madison Technologies Life Sciences Holdings (who are not named in any of the causes of action above);

e. As an alternative remedy if so elected at a later time rescission of the Confidential Settlement Agreement and the Madison Transaction to the extent not shown by Defendants Connie Ryan and Larry Gies to be subject to a subject to a safe harbor under Neb. Rev. Stat. § 21-2,121(b)

f. Pre-judgment and post-judgment interest at the maximum rate allowed by law;

g. Issuance of a declaratory judgement declaring void the Confidential Settlement Agreement and/or the entire Madison

Transaction on the basis that Connie Ryan exceeded the authority granted her by the Streck Board.

h. Reasonable attorneys' fees and costs of suit pursuant to the Nebraska Securities Act and/or as otherwise allowed by law; and

i. Such other and further relief as the Court deems just and equitable.

j. An award of damages under Count XI as allowed under the Restatement (Second) of torts for Invasion of Privacy.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

By: *<u>/s/ Paul D. Heimann</u>*

Paul D. Heimann, #21727
The Orr Law Group, PLLC
9375 Burt Street, Suite 200
Omaha, NE 68114
(402) 408-6488
paulh@orrlawgrp.com
*Attorney for Plaintiffs*